LUIS ANTONIO LLERAS Y OTROS, demandantes y recurridos, *v.* SALVADOR TIÓ MONTES DE OCA, SALVADOR TIÓ FERNÁNDEZ, demandados y recurrentes.

*Numero:* R-72-269 *Resuelto:* 9 de abril de 1974

*Guillermard, Miranda, Cárdenas & Gallardo, Angel R. de Corral Juliá, Germán Cestero Rodríguez* y *Julio O. Rivera,* abogados de los recurrentes; *Correa Suárez & González Correa,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

Ana Marta Vázquez conducía su automóvil Opel modelo 1960 dentro del área de aparcamiento del Hospital Auxilio Mutuo. Le acompañaban Luz H. Jiménez y Aida Rosa Paz. Ana Marta detuvo su automóvil como a 20 pies detrás de un automóvil Volkswagen modelo 1959 que era conducido por el codemandado Salvador Tió Fernández, estudiante de cuarto

año de Escuela Superior en aquél entonces y quién tenía licencia para conducir.

El Volkswagen inició marcha atrás, en una operación para aparcarse, y al hacerlo chocó con el Opel antes mencionado. Con motivo del choque vinieron en contacto la parte trasera izquierda del Volkswagen y la parte delantera derecha del Opel. Al Volkswagen se le abolló el tapalodo trasero izquierdo y se le rompió el farol izquierdo trasero que estaba localizado en dicho tapalodo. Al Opel se le rompió la bombilla de parqueo delantera derecha, se le abolló un poco el tapalodo delantero derecho y se le dobló la punta derecha del parachoques delantero. Expresa el juez de instancia en su opinión que los daños que sufrió el Opel se estiman en $150.00.

Declaró Tió Fernández que luego del accidente las tres damas que iban en el Opel, se bajaron del mismo, conversaron con él sobre el accidente, tomaron la información usual en esos casos, se habló de que el estudiante Tió Fernández consultaría con su padre sobre lo ocurrido, y que él (Tió Fernández) no notó nada anormal en las tres damas mencionadas.

Ana Marta Vázquez declaró que no sintió gran cosa al momento del choque. Aida Rosa Paz dijo que se sintió aturdida. Luz Jiménez, en cambio, declaró que se sintió nerviosa, que sintió el cuello "trancado," que no podía moverlo y que se sintió mareada y con dolor de cabeza. Luz Jiménez y Aida Rosa Paz fueron el día del accidente a la sala de emergencia del Auxilio Mutuo para que se les examinara. Ana Marta lo hizo al día siguiente.

Las tres declararon que el Auxilio Mutuo las refirió al Fondo del Seguro del Estado, donde recibieron tratamiento con pastillas relajantes y en donde posteriormente se les dio algún tratamiento de fisioterapia.

A la fecha del accidente las tres damas eran fisioterapistas y las tres trabajaban en el Auxilio Mutuo. Posteriormente Ana Marta Vázquez y Luz Jiménez trabajaron en el

Fondo del Seguro del Estado en calidad de fisioterapistas. Era cuñado de Ana Marta el Director Médico Interino del Fondo, Dr. Luis Canales. La esposa del Dr. Canales era también fisioterapista en el Fondo. Ambas recibieron compensación del Fondo del Seguro del Estado con motivo de espasmos musculares.

Las tres declararon que tienen que dormir en camas ortopédicas, sin almohadas después del accidente. También declararon las tres que sienten dolores de cabeza, del cuello, de los hombros, de la espalda y de las piernas. Las tres declararon también que esporádicamente tienen que faltar al trabajo por motivo de los dolores mencionados. Ana Marta Vázquez tuvo que ser confrontada con una deposición tomada a ella para que recordara que cerca de dos años *antes* del accidente había recibido tratamiento debido a dolores en la espalda y en una pierna y que había sufrido de inflamación de un tendón en el hombro.

La prueba médica en relación con el caso de Ana Marta Vázquez consistió del testimonio del Dr. José Alvarez, quien también trabajaba o había trabajado en el Auxilio Mutuo y en el hospital del Fondo del Seguro del Estado y quien conocía personalmente a las tres reclamantes.

Declaró el Dr. Alvarez que Ana Marta Vázquez lo consultó por primera vez en enero de 1966, ó sea, dos años y dos meses *después* del accidente que motivó este pleito. Ella le expresó al doctor que sentía dolores como consecuencia de un accidente en que su automóvil *fue embestido por detrás* por otro automóvil. El facultativo sospechó la presencia de una enfermedad discogénita en las regiones cervical y lumbar, y recomendó a Ana Marta que durmiera en cama dura, que no usara almohada, que no hiciera esfuerzos físicos y que recibiese tratamiento de fisioterapia. El doctor también declaró que *podría haber relación* entre el accidente y la condición física de Ana Marta. Luego explicó que la aplicación de fuerza de atrás hacia adelante produce lo que se conoce

como *whiplash* y que sus resultados pueden manifestarse varios días o semanas después y ser temporales o permanentes. Si la fuerza o el cuerpo viene del frente, explicó el doctor, ocurre un *reverse whiplash*. En relación con un informe del Dr. Luis Guzmán que el Dr. Alvarez tenía en sus manos, declaró que la condición allí mencionada *podría* ser un resultado del accidente. Dicho informe indicaba que Ana Marta presentaba una pérdida sensorial y una miositis cervical. La miositis, explicó, es el endurecimiento de un músculo. En cuanto a la pérdida sensorial explicó que esa condición *puede resultar* de un deterioro normal de la persona o de un trauma.

En el contrainterrogatorio el Dr. Alvarez declaró que conocía a Ana Marta desde hace 15 años; que ella tiene la curva cervical revertida, lo que en ausencia de otra causa, se origina por espasmos musculares. Los espasmos, añadió, *pueden* ser producidos por infecciones, virus o trauma. También dijo que los espasmos lumbares pueden producir espasmos en el cuello. Admitió el doctor que los espasmos musculares paravertebrales, cervicales y lumbares pueden ser consecuencia de tensión nerviosa o de haber hecho esfuerzos físicos en forma descuidada, como por ejemplo, en el trabajo de administrar fisioterapia. Expresó el Dr. Alvarez que él no le recomendó a Ana Marta el uso de un collar cervical, sino que se lo recomendó otro médico y que estuvo bien recomendado.

En relación con Luz Jiménez declaró el Dr. Cándido Martínez. Declaró que la examinó en febrero de 1972 (más de 9 años después del accidente, el cual ocurrió en 25 de octubre de 1963), y que encontró una "deficiencia en la enervación de las extremidades superiores," una enervación de los reflejos tendinosos y una disminución de los movimientos del cuello, espalda y extremidades superiores. También declaró que los espasmos *pueden* ser consecuencia de un impacto causado por otro vehículo al vehículo en que va la persona.

En la repregunta el Dr. Cándido Martínez declaró que Luz Jiménez trabajaba con él en el Auxilio Mutuo, en el Departamento de Fisiatría. No la había examinado antes de febrero de 1972. Declaró que la curvatura de la espina dorsal de Luz Jiménez era normal; que en el caso de ella el espasmo, *si lo había,* no era tan severo como para producir curvatura. Añadió que el espasmo puede ser fingido, pero que el paciente no puede sostenerlo porque se cansaría; que un espasmo persistente requiere tracción y que un espasmo leve ocurre esporádicamente y permite movimientos. Declaró que Luz Jiménez no tiene nada anormal en los discos.

La prueba médica de los demandados consistió del testimonio del Dr. Aníbal Lugo, profesor y jefe de los servicios de ortopedia en la Escuela de Medicina y en el Centro Médico. Declaró que conoce bien el tratamiento que administran los fisiatras y que fueron los ortopedas quienes originaron esa clase de tratamiento. Añadió que el trabajo de fisioterapia es un trabajo fuerte, que requiere movimientos de la espalda y que puede causar sensibilidad en los músculos del trapecio. Examinó a Aida Rosa Paz en 28 de enero de 1966 en relación con el accidente de este caso. Encontró la presencia de un área de sensibilidad en la cadera izquierda, lo que llamó una miositis o molestia muscular esporádica. Expresó el doctor que no es posible decir con certeza que esa condición fue producida por un choque automovilístico; que la misma puede también ser el producto de un golpe, de una torcedura o de bursitis. Declaró que se tomaron radiografías de la pelvis y de la cadera izquierda de Aida Rosa y que las radiografías no demostraron anormalidad alguna. Declaró que la miositis puede surgir sin razón aparente.

El mismo facultativo examinó a Ana Marta Vázquez y encontró áreas de espasmo y sensibilidad en el cuello; limitación en los movimientos del cuello, especialmente al mover la cabeza hacia atrás y hacia el lado izquierdo; espasmos en los músculos del hombro y de la espalda; y sensibilidad en los

músculos de la región lumbar. Concluyó que Ana Marta padecía de miositis generalizada y expresó que no se puede decir que ese estado se deba al accidente automovilístico.

En relación con el examen practicado a Luz Jiménez, el Dr. Aníbal Lugo declaró que los movimientos de la región cervical y del cuello eran normales, pero que ella se quejaba. No encontró evidencia de espasmo en los músculos. Encontró alguna sensibilidad en los trapecios y pérdida de la curva normal del cuello, lo cual pudo haber sido causado por espasmo de los músculos del cuello, o al realizar una flexión de los músculos más allá de lo normal. Declaró que la curva también puede producirse voluntariamente contrayendo los músculos del cuello. Añadió el doctor que el estado de Luz Jiménez no era necesariamente consecuencia de un accidente automovilístico y que podía ser consecuencia de sus labores como fisioterapista.

También declaró el doctor que los impactos delanteros hechos por un vehículo a otro por lo general no producen grandes lesiones en el cuello, a diferencia de los impactos traseros y que en el caso de los impactos delanteros éstos tienen que ser de magnitud considerable para que produzcan lesiones de importancia. Como se sabe, el impacto delantero impulsa el cuerpo hacia atrás y la cabeza dobla hacia adelante, lo cual es un movimiento fácil y común. El impacto trasero impulsa el cuerpo hacia el frente y la cabeza dobla hacia atrás, lo cual no es un movimiento fácil ni común.

En el contrainterrogatorio el Dr. Lugo explicó, en relación con Ana Marta Vázquez, que él diría que los síntomas que en ella se advertían *dos años después* del accidente no se debían al impacto delantero de que fue objeto su automóvil. Admitió que eso era "posible" pero aclaró que era "muy improbable". Se le mostraron al doctor dos fotografías del Opel y se le preguntó si los síntomas que se advertían en las tres damas demandantes en el año 1966, cuando él las examinó, podían ser consecuencias del accidente ocurrido en el año

1963 y el facultativo contestó "No, señor." Añadió que el automóvil "debería demostrar un impacto de más efectividad y debería demostrar más daño."

El codemandado Tió Fernández declaró que él no sintió golpe alguno en su persona como consecuencia del accidente. Igualmente declaró Rafael Vilá, quien le acompañaba en dicho autómovil. Como dijimos antes, el Volkswagen en el cual viajaban sufrió una abolladura en el guardalodo y se rompió la bombilla que el automóvil tenía localizada en dicho guardalodo. Vilá declaró que él oyó o sintió algo así como "un pequeño golpe, algo así como un guayaso," y que el Volkswagen retrocedió a una velocidad que podía estimarse de tres a cinco millas por hora.

El tribunal de instancia creyó que la condición física de las demandantes fue producida por el accidente y en su sentencia concedió daños por un total de $13,200.00 más $1,000.00 para honorarios de abogado, para un gran total de $14,200.00.

Los recurrentes señalan los siguientes dos errores: (1) que el tribunal de instancia erró en la apreciación de la prueba y al determinar que existe un nexo causal entre el accidente y el estado posterior de las demandantes; y (2) que erró al concluir que se estipularon los daños causados al automóvil Opel.

Del estudio que hemos hecho en este caso se desprende que éste es uno en que se justifica que aquilatemos la prueba. 4 L.P.R.A. sec. 36. Entendemos que el primer error se cometió. El perito médico de los recurrentes expresó en forma categórica que los síntomas que las recurridas tenían en el año 1966, cuando fueron examinadas por él, no fueron causados por el accidente ocurrido en el año 1963, ya que las fotografías del automóvil Opel revelaban que se trató de un impacto leve.

Por otro lado, las recurridas pudieron haber traído mejor prueba que el testimonio de dos médicos que las examina-

ron *más de dos años después* de ocurrido el accidente y después de presentada la demanda. Estos médicos solamente establecieron que *podía* haber relación entre el accidente y el padecimiento de las recurridas. Eso no basta. Prácticamente todo es posible y por ello los tribunales no podemos fallar y conceder daños a base de que tal o cual síntoma o condición *puede* que tenga relación con algún hecho lejano. Es necesario que se establezca una relación causal menos endeble, una relación más probable, más racional y más creíble. Hay un gran trecho entre lo que es posible y lo que es probable.

Hubiese sido de mayor peso y de más cercana relación entre el accidente y sus consecuencias si las demandantes hubiesen traído prueba de exámenes y de tratamientos realizados a raíz o poco después del accidente. Eso hubiese permitido al tribunal formar un juicio más probablemente correcto y más justo en relación con la alegada responsabilidad de los codemandados. Esa prueba no se presentó. La Ley de Evidencia, recogiendo en su texto realidades de la experiencia y de la sicología humana, dispone que la evidencia voluntariamente suprimida resultaría adversa si se ofreciere y que la evidencia superior se presume adversa a la presentación de otra inferior. 32 L.P.R.A. sec. 1887, incisos 5 y 6.

Debe observarse también que aparentemente el Dr. Alvarez fue inducido a creer que el automóvil Opel fue chocado por detrás, lo cual no es correcto. Ya anteriormente hemos descrito en síntesis la mayor peligrosidad que conlleva un choque de esa naturaleza en comparación con un choque o un impacto por la parte delantera de un vehículo.

En cuanto al segundo error, relativo a si se estipuló o no la suma de $150.00 como el valor de los daños sufridos por el Opel, hay una serie de incidentes en el récord que podríamos relatar pero que no creemos necesario hacerlo. Concluimos que aunque en una forma no muy precisa, se estipularon dichos daños y en consecuencia resolvemos que no se cometió el segundo error.

En vista de lo anterior, *se modificará la sentencia dictada en este caso por el Tribunal Superior, Sala de San Juan, en 22 de agosto de 1972, en el sentido de eliminar todas las partidas menos la de $150.00 por los daños causados al automóvil Opel. Así modificada se confirmará.*

Los Jueces Asociados Señores Martín e Irizarry Yunqué, no intervinieron.