CAMILA CANALES VELÁZQUEZ, demandante y recurrida, v. MIGUEL A. ROSARIO QUILES, demandado y recurrente.

*Número:* R-77-201          *Resuelto:* 16 de octubre de 1978

758

*Ludwig Ortiz Belaval* y *Samuel D. Pagán Ayala,* abogados del recurrente; *Santiago Polanco Abreu,* abogado de la recurrida.

El Juez Asociado Señor Negrón García emitió la opinión del Tribunal.

Mientras la Sra. Camila Canales Velázquez discurría por el carril izquierdo de la Avenida Baldorioty de Castro en Santurce, le estalló una de las gomas traseras de su vehículo; de inmediato hizo señales y obtuvo permiso de paso de los conductores que transitaban por el carril del centro para alcanzar el derecho y allí cambiar la llanta; e inmediatamente se dirigió diagonalmente al carril derecho—por el cual no discurría ningún auto—y mientras enderezaba su vehículo oyó un chillido de gomas y pudo observar por su espejo retrovisor que del carril del centro había salido un automóvil en dirección a la trocha que ella estaba ocupando, el cual, conducido por su dueño el Sr. Miguel A. Rosario Quiles la impactó por la parte derecha trasera. Los autos no sufrieron grandes daños y al parecer, tampoco sus ocupantes.

No obstante, al otro día la señora Canales Velázquez fue llevada al Hospital Presbiteriano quejándose de fuertes dolo-

res en la región del cuello. En dicha institución recibió tratamiento ambulatorio debido a que las radiografías que le tomaron de la región cervical no mostraban nada anormal. Sin embargo, por persistirle los dolores en el área, acudió a la Administración de Compensaciones por Accidentes de Automóviles (A.C.A.A.) siendo referida al ortopeda Dr. Marino Rodríguez, quien la evaluó y remitió al neurólogo Dr. Gerry Anderson, quien comenzó su tratamiento. Ante ambos galenos la señora Canales se quejaba de dolores de espalda hacia la región cervical y lumbosacral, sensaciones de adormecimiento y debilidad en el lado izquierdo del cuerpo. El examen del Dr. Anderson reveló espasmos musculares agudos, limitación de movimiento en las regiones cervicales y lumbosacrales e inflamación en los músculos pectorales izquierdos. Por dicho cuadro le prescribió una serie de medicamentos, y la refirió a la fisiatra Dra. Mercedes Stefani, quien la sometió a un riguroso programa de terapias y le recomendó el uso de un collar cervical.

Así las cosas y ante el hecho de que no mejoraba la condición de la paciente, se le practicaron nuevos estudios que revelaron que uno de los nervios estaba pinchado a uno de los discos intervertebrales. [1] Para corregir tal condición, la señora Canales fue referida al neurocirujano Dr. Nathan Rifkinson, quien la sometió a una intervención quirúrgica. Luego de tal operación, se reanudó el tratamiento y la terapia de la paciente, ya que los padecimientos aunque en grado menor han persistido especialmente en la región cervical, provocando que ésta no pueda doblarse, levantar peso, ni estar mucho de pie, ni sentada como tampoco caminar mucho.

---

[1] En términos médicos el concepto "disco intervertebral" representa el fibrocartílago entre los cuerpos de las vértebras. *Diccionario Terminológico de Ciencias Médicas*, Octava Edición, Salvat, (1963).

Concurrente con el tratamiento, la señora Canales Velázquez radicó demanda en daños contra Rosario Quiles imputándole negligencia y haber sufrido como consecuencia del accidente, dolorosas lesiones, consistentes éstas en una torcedura(²) cervical(³) (*cervical sprain or whiplash*) y una torcedura lumbosacral (*lumbosacral sprain*) (⁴) de las cuales ha estado recibiendo intensos tratamientos desde el otro día del suceso que la mantuvieron imposibilitada de trabajar por un período de dos meses. Reclamó $30,000.00 por las lesiones físicas, $15,000.00 por los sufrimientos y angustias mentales, $200.00 para la reparación de su automóvil y $10,000.00 de honorarios de abogado. El demandado Rosario Quiles contestó aceptando la ocurrencia del accidente y negando que el mismo se debiera a su culpa o negligencia. Alegó que la demandante, sin hacer las señales requeridas por la ley, negligentemente había invadido el carril por donde él discurría.

---

(²) *Torcedura o esguince* se define como ". . . distensión violenta de una articulación, sin luxación, que puede llegar a la rotura de algún ligamento o de fibras musculares próximas. Se caracteriza por dolor, tumefacción rápida e incapacidad para los movimientos." *Diccionario Terminológico de Ciencias Médicas*, Capdevila, 4ta. edición, 1952, Ed. Salvat. *"Sin. luxación"* significa que no hay "dislocación permanente de una parte, especialmente de las superficies articulares de los huesos". *Id.*

(³) Por *torcedura cervical* se entiende "un tipo de lesión resultado de la sacudida del cuello (whiplash mechanism). . . . Inmediatamente después del accidente no se siente nada, o solamente un leve dolor y limitación de movimiento. No obstante, después de 6 a 48 horas se desarrolla dolor y definitivamente se limita la capacidad de movimiento, . . . . En algunos pacientes puede necesitarse cirugía de haber surgido una dislocación (extrusion) del disco cervical, . . . . La persistencia de los síntomas puede causar ansiedad y depresión." Schmidt's *Attorneys' Dictionary of Medicine*, Vol. 1, 1977. Matthew Bender. (Traducción nuestra.)

(⁴) *Torcedura lumbosacral* comprende "la dislocación entre la quinta vértebra lumbar y el sacro. La causa usual es haber realizado fuerza con la parte baja de la espalda. Se revela por dolor (especialmente al moverse), sensibilidad, espasmos musculares y limitación de movimientos. Tiene tendencia a recurrir." *Id.* (Traducción nuestra.)

Reconvino por la suma de $35.00 para reparar su auto y $50.00 por pérdida de uso del mismo.

Previa vista en su fondo el tribunal de instancia dictó sentencia declarando con lugar la demanda y condenando al demandado a satisfacer la cantidad de $20,000.00 por los daños físicos y angustias mentales; ([5]) intereses sobre esa suma, costas y gastos del pleito y $400.00 por concepto de honorarios de abogado. La reconvención fue desestimada.

A solicitud del demandado y en consideración a los siguientes errores, expedimos auto de revisión:

PRIMERO: "Cometió error el Tribunal Sentenciador al concluir y resolver que era admisible evidencia sobre daños que alegadamente sufriera la parte demandante, daños que no fueron expresamente alegados en la demanda y que en ninguna otra forma fueron informados al demandado recurrente."

SEGUNDO: "Cometió error el Tribunal al no imponer ningún grado de negligencia a la recurrida al no aplicar la doctrina de negligencia comparada."

TERCERO: "Erró la Sala Sentenciadora al estimar los daños y al establecer que había una relación causal entre los mismos y el accidente, según apreció la prueba."

CUARTO: "Erró el Tribunal de Primera Instancia al apreciar la prueba relacionada con la forma en que ocurrió el accidente."

QUINTO: "Erró el Tribunal Sentenciador al condenar al recurrente al pago de costas, gastos, $400.00 en concepto de honorarios de abogado e intereses sobre la sentencia de $20,000.00 desde el momento de la radicación de la demanda."

SEXTO: "Cometió error el Tribunal al estimar los daños recibidos por la demandante en $20,000.00."

---

([5]) Tal suma se reduciría en $1,000.00 por la aplicación de la Sec. 9 de la Ley de Protección Social por Accidentes de Automóviles. 9 L.P.R.A. sec. 2058.

# I

■ Mediante el primer error ·el recurrente cuestiona la admisibilidad de prueba sobre daños no alegados expresamente en la demanda ni informádosle de otro modo. Se refiere a las lesiones relativas a los nervios cervicales, la de los discos que conllevó una operación, los espasmos musculares y uso del collar cervical. Nuestro análisis refleja que efectivamente la sala sentenciadora admitió prueba de tales lesiones bajo la teoría de que estaban eslabonadas y eran consecuencia de los daños alegados en la demanda; (6) al emitir su dictamen las consideró para fines de la compensación.

El error no fue cometido. Primeramente, el recurrente conocía desde enero de 1975 el ámbito y seriedad de las lesiones por la información consignada en la respuesta número 23 del interrogatorio que cursara a la reclamante. En la respuesta se brinda un cuadro global de las múltiples dolencias, tratamientos, médicos que intervinieron, incluyendo data sobre la operación quirúrgica con carácter correctivo planeada para dicho mes, acompañándose los documentos corroborativos de estos extremos. Ante este conocimiento, no puede quejarse de sorpresa alguna.

■ Y en segundo lugar, la evidencia cuestionada ante nos surgió del testimonio de la propia demandante, quien descri-

---

(6) En el campo de la medicina se reconoce que las lesiones a los nervios cervicales, así como las de los discos y los espasmos musculares, pueden surgir como consecuencia de una torcedura cervical o lumbosacral. Ello lo corrobora la propia definición de tales conceptos (véanse notas 3 y 4) y el testimonio del perito de la parte demandante, la Dra. Mercedes Stefani, quien en parte expuso lo siguiente: "Ella recibió un impacto que causa que la parte interior del cuerpo lumbosacral vaya al frente. La cabeza está sobre una base fina, comparado al resto del cuerpo, y es completamente movible, y se va hacia atrás en hipertensión y vuelve hacia el frente. Durante ese proceso se lastiman todos los nervios que salen del cordón espinal. Hay lesión del ligamento muscular, tendones, edemas y hematomas internos. Eso mismo pasa en la lumbosacral. Afecta al lumbar que se va al frente y luego atrás." (E.N.P., 4.)

bió en detalle todos los padecimientos que había venido sufriendo con motivo del accidente (T.E. págs. 25–33). Tocaba a la parte demandada en dicha etapa objetar su admisibilidad; al no hacerlo,(7) brindó implícitamente su consentimiento y permitió se estimaran enmendadas las alegaciones según lo dispuesto en la Regla 13.2 de las de Procedimiento Civil. *Srio. del Trabajo* v. *Vélez*, 86 D.P.R. 585 (1962); *Doyle* v. *Polypane Packaging Co.*, 80 D.P.R. 224 (1958); *Betancourt* v. *U.S. Fidelity and Guaranty Co.*, 78 D.P.R. 650 (1955); *Arvelo* v. *Román*, 65 D.P.R. 743 (1946). Tampoco eran procedentes las objeciones en torno a la declaración de la Dra. Mercedes Stefani, en cuanto a la hospitalización de la demandante y las lesiones. En el momento de las mismas, según expuesto, las alegaciones habían sido enmendadas por prueba no objetada.

## II

El segundo señalamiento versa sobre la aplicabilidad o no de la doctrina de negligencia comparada en virtud de los siguientes hechos sobre los cuales no hay controversia: (1) explosión de la llanta del automóvil con la necesaria maniobra de cambio de carriles; y (2) que la demandante no usaba los cinturones de seguridad disponibles al momento del accidente.

Atendamos primeramente el apuntamiento relacionado con la explosión de la llanta y sus efectos. A juicio del demandado recurrente se le debe imponer responsabilidad a la parte demandante por mantener las ruedas de goma de su automóvil sumamente gastadas,(8) ya que en Puerto Rico se exige que

---

(7) La única objeción que consta en récord, sostenida por el tribunal, presentada por la representación legal de la parte demandada recurrente fue cuando la demandante recurrida atestó que como resultado de los estudios del Dr. Mercado, éste ". . . encontró que tenía un . . . los nervios me estaban pinchando los discos." T.E., pág. 28.

(8) La demandante aceptó este hecho (T.E. págs. 44–45).

los dueños y conductores de vehículos de motor los mantengan en buenas condiciones.(9) Aunque sin decirlo, taxativamente el argumento presupone que la explosión fue causada por el estado de deterioro de la llanta y no otra causa.

■ Ante el hecho básico e irrefutable de que el neumático que estalló estaba desgastado, podemos inferir y concluir como correcta la premisa antes expuesta. Ante esta realidad opinamos que la demandante fue negligente por tal actuación, máxime habiendo ella aceptado tener conocimiento de la condición precaria de dicho neumático.(10) El deterioro del neumático y su explosión fue la causa inicial de una serie de eventos que finalizaron en la ocurrencia del accidente, y su relevancia en el presente cuadro de hechos fue decisiva. Exigió de la demandante la inmediata maniobra de emergencia relativa a los cambios de dos carriles en una vía principal transitada por otros vehículos; debió prever que mantener una goma en ese estado podía producir o contribuir a un accidente. *Pérez Rivera* v. *Olazagasti Fiol*, 90 D.P.R. 779 (1964) y *Quiñones* v. *Hertz Rent A Car*, 106 D.P.R. 533 (1977). Estimamos que tal actuación debe reducir su compensación en un veinticinco por ciento (25%). Según dijimos en *Rivera* v. *Rivera Rodríguez*, 98 D.P.R. 940, 943 (1970) y reafirmamos en la presente:

"El dueño y operador de un vehículo de motor tiene el deber de ejercer cuidado ordinario para que el vehículo esté en condi-

---

(9) La Ley de Vehículos y Tránsito dispone:

"Todo vehículo de motor que transite por las vías públicas deberá llevar el equipo que por este Capítulo se requiere, *en buenas condiciones de funcionamiento* y de ajuste y dicho vehículo deberá estar en condiciones mecánicas tales que el mismo no constituya una amenaza para la seguridad pública." 9 L.P.R.A. sec. 1191. (Bastardillas nuestras.)

(10) Véanse: Blashfield, *Automobile Law and Practice*, Sec. 107.22; *Liability of Motor Vehicle Owner or Operator for Accident Occasioned by Blowout or Other Failure of Tire*, 24 A.L.R.2d 161, 177.

ciones de razonable seguridad mecánica y adecuadamente equipado, según sostiene correctamente la parte recurrente. Entre esos deberes está el de ejercer cuidado razonable en la inspección del vehículo para descubrir defectos o averías que impidan su operación normal, dentro de un marco de razonable seguridad. De ahí que se le impute el conocimiento de defectos latentes o defectos que una inspección razonable hubiese descubierto."

El segundo aspecto es novel y nos permite pautar una norma sobre el uso de los cinturones de seguridad en nuestro país. Ello exige una breve exégesis en torno al impacto jurídico que ha tenido y tiene tal medida de seguridad en otras jurisdicciones y en Puerto Rico.

Hasta hace unas décadas el énfasis en la industria automotriz era concentrar sus mejores esfuerzos en el diseño, estilo, velocidad y otros lujos—algunos necesarios y otros no —al manufacturar vehículos de motor. La potencia alcanzada en los motores, la multiplicación de conductores y vehículos, unidos al desarrollo de vías y expresos de gran velocidad, tuvo como consecuencia un aumento en personas muertas e incapacitadas, víctimas de accidentes. *González* v. *Seatrain Lines of P.R.*, 106 D.P.R. 494 (1977). Las estadísticas anuales de estos casos incrementaron notablemente, hasta que se desarrolló una clara conciencia de que en cierto grado algunas de estas fatalidades o lesiones graves podían evitarse o mitigarse. La atención se enfocó sobre ciertas medidas de seguridad básicas, sencillas y económicas entre las cuales se destacó el *cinturón de seguridad*. Con el advenimiento de este aditamento—como medio efectivo de evitar y disminuir algunas lesiones físicas ocasionadas por accidentes vehiculares —en la década de los años 60 comenzó en los Estados Unidos un movimiento por parte de las legislaturas estatales que culminó con la aprobación de múltiples leyes requiriendo que los vehículos viniesen equipados con los mismos.

■ Aunque originalmente se debatió su efectividad, al presente no existe polémica sustancial al respecto. Se acepta que los cinturones de seguridad evitan o reducen los daños ocasionados por el "segundo accidente", que es aquel que ocurre cuando el cuerpo del ocupante viene en contacto con el interior del vehículo luego de recibir el impacto inicial del "primer accidente".[11] *Seat Belt Negligence in Automobile Accidents*, 1967 Wis. L. Rev. 288, 292; *The Seat Belt Defense —The Sophist's Escape*, 41 Temp. L.Q. 126, 131 (1967); Kircher, *The Seat Belt Defense—State of the Law*, 53 Marq. L. Rev. 172, 183 (1970); Bowman, *Practical Defense Problems—The Trial Lawyer's View*, 53 Marq. L. Rev. 191, 195 (1970); McCann, *The Seat Belt Defense in Canada*, 42 Sask. L. Rev. 75, 88 (1977).

Se pone en práctica un principio elemental aceptado en la disciplina de la Ciencia Física. Se amortigua la acción generada por una colisión entre dos cuerpos—automóviles y otros objetos—mediante un mecanismo, cinturón de seguridad, que interrumpe y regula—cambiando, modificando o disminuyendo—el contacto, choque y desplazamiento natural e incontrolable de un cuerpo humano con los interiores de un vehículo, producido por la intensidad de la referida fuerza inicial.

Sin embargo, su existencia dio pie a que surgieran una serie de controversias respecto a cómo quedarían afectadas las personas en sus reclamaciones judiciales por daños físicos a causa de un accidente vehícular, al demostrarse que al momento del suceso no usaban tales cinturones. *Torts: Negligence in Failure to Use Seat Belts*, 52 Minn. L. Rev. 918, 923 (1968); *The Emerging Seat Belt Defense: Two Views*, 5

---

[11] La ilustrada sala sentenciadora describe este fenómeno físico al concluir: "Al ser impactado el vehículo Volkswagen de la demandante, por el vehículo del demandado, el *cuerpo* de la demandante *se le sacudió dos veces hacia el frente y una vez hacia atrás.*" (Bastardillas nuestras.)

Akron L. Rev. 129, 142 (1972); *Self-Protective Safety Devices: An Economic Analysis*, 40 U. Chi. L. Rev. 421, 435, n. 51 (1973).

Varios estados—Iowa, Maine, Minnesota, Tennessee y Virginia ([12]) —reaccionaron aprobando legislación que expresamente declaraba inadmisible en una acción por daños, prueba sobre la no utilización de los cinturones de seguridad del vehículo, o que de admitirse no se estimaría como evidencia indicativa de negligencia. *The Emerging Seat Belt Defense: Two Views*, supra. En otros estados los foros judiciales, debido a la falta de directrices legislativas, asumieron diferentes posturas. Algunos consideraron que el no uso de los cinturones era constitutivo de negligencia per se, otros lo estimaron como negligencia contribuyente y por último, algunos entendieron que ello impedía al afectado recobrar los daños que su uso hubiese evitado, o sea, aplicaron una dimensión de la doctrina de mitigación de daños. Kircher, *The Seat Belt Defense—State of Law*, supra, pág. 173; *Mitigation of Damages—Use of Seatbelt*, 80 A.L.R.3d 1033; *Spier v. Baker —Negligence—Seat Belts—Mitigation of Damages*, 3 Hofstra L. Rev. 883, 887 (1975); *Automobile Occupant's Failure to Use Seat Belt as Contributory Negligence*, 15 A.L.R.3d 1428; Note, *Seat Belt and Contributory Negligence*, 12 S.D. L. Rev. 130 (1967). Con respecto a la primera postura, es menester indicar que la mayoría de los tribunales se negaron a aplicarla debido a la ausencia de estatutos que dispusieron el uso compulsorio de los cinturones de seguridad; y que los que lo hicieron fue vía la doctrina del "hombre prudente y razonable". Kircher, *The Seat Belt Defense—State of Law*, supra, pág. 174; Fischer, *The Medical and Legal Problems*

---

([12]) Iowa Code Ann. 321, 445 (1965); Maine Ann. Stat. 29, Sec. 1368-A (1965); Minnesota Stat. Ann. 169, 685 (Supp. 1971); Tennessee Code Ann. 59-930 (1963); y Virginia Code Ann. 46.1, 309.1 (Supp. 1970).

*Arising From the Failure to Wear Seat Belts*, 27 U. Miami L. Rev. 130, 141 (1972) ; *Spier v. Baker—Negligence—Seat Belts—Mitigation of Damages*, supra, pág. 887. Un ejemplo de ello lo constituye el caso de *Bentzler* v. *Braun*, 149 N.W.2d 626 (1967), en el cual el Tribunal Supremo de Wisconsin, en ausencia de ley sobre el asunto, decidió que constituía negligencia el no uso de los cinturones, ya que un hombre prudente y razonable podía prever que para su debido cuidado debía ajustarse los mismos.

■ En nuestro país no fue hasta el año 1973 que se aprobó una directriz legislativa respecto al uso de los cinturones. En virtud de las Leyes Núms. 55 y 56 de 30 de mayo de 1973—que adicionaron las Secs. 5-1123 y 6-306, respectivamente, a la Ley de Vehículos y Tránsito de Puerto Rico, con vigencia al 1 de enero de 1974—se hizo compulsorio su uso, ([13]) y se indicó qué clase de vehículos deberían estar equipados con los mismos. ([14])

---

([13]) En los siguientes países también es compulsoria la utilización de esta medida de seguridad por los ocupantes de vehículos de motor: Australia, Canadá (Provincias de Ontario, Nova Scotia y Saskatchewan), Nueva Zelandia, Francia, España, Israel, Checoslovakia, Bélgica, Holanda, Suiza, Suecia, Malawi, Dinamarca, Finlandia, Alemania y la Unión Soviética. Wakeling, *Seat Belt Legislation: An End to Cruel and Unusual Punishment*, 42 Sask. L.Rev. 105 (1977).

([14]) La disposición central de la referida ley de 1973 rezaba:

"(a) Toda persona que conduzca un vehículo de motor por las vías públicas, el cual deba estar equipado con cinturones de seguridad de acuerdo a la Sección 6-306 de esta ley, vendrá obligada a ajustarse alrededor del cuerpo y a abrocharse dichos cinturones.

"(b) Toda persona que viaje como pasajero en un vehículo de motor el cual deba estar equipado con cinturones de seguridad de acuerdo a la Sección 6-306 de esta ley y cuyos cinturones estén disponibles para su uso, vendrá igualmente obligada a ajustarse alrededor del cuerpo y a abrocharse dichos cinturones mientras el vehículo se está conduciendo por las vías públicas.

"(c) Esta sección no aplicará:

"(1) a conductores o pasajeros que estén impedidos del uso de

Apenas pasado un año, la Legislatura derogó tales medidas mediante la Ley Núm. 176 de 23 de julio de 1974 y en sustitución promulgó las Secs. 5-1401–5-1404 del Art. XIV de la Ley de Vehículos y Tránsito de Puerto Rico. Respecto a la obligatoriedad, en lo pertinente estatuyó:

"(a) Toda persona que *conduzca* o *viaje como pasajero* por las vías públicas en un vehículo de motor que deba estar equipado con cinturones de seguridad de acuerdo a la Sección 5-1401 de esta ley cuyos cinturones estén disponibles y en condiciones para *su uso, vendrá obligada a ajustarse alrededor del cuerpo y a abrocharse* dichos cinturones mientras el vehículo se está conduciendo por las vías públicas." (Bastardillas nuestras.) 9 L.P.R.A. sec. 1212.

Esta versión añadió una nueva excepción a la regla que exige el uso compulsorio de los cinturones y es de notar que la penalidad por su infracción fue eliminada. Al presente un precepto aparte dispone que ello conllevará una falta administrativa. (9 L.P.R.A. sec. 1214.)

---

cinturones de seguridad, por razones médicas o físicas y que posean una certificación médica que así lo certifique.

"(2) a conductores por razones ocupacionales.

"(3) a niños en que el uso del cinturón constituiría un riesgo a su persona.

"(4) a un conductor que esté frecuentemente deteniendo el vehículo y desmontándose o entregando o recibiendo propiedad en el vehículo siempre y cuando que la velocidad del vehículo entre las paradas no exceda de 15 millas por hora.

"(5) cuando el uso del cinturón que se ajusta sobre el hombro interfiera con la operación del vehículo.

"El Secretario establecerá, mediante reglamentación que adopte al efecto, aquellos requisitos necesarios para que un conductor pueda acogerse a las exclusiones que este inciso establece.

"(d) Toda persona que infringiere lo dispuesto en esta sección incurrirá en delito menos grave y convicta que fuere será castigada al pago de una multa que no será menor de diez (10) dólares ni mayor de veinticinco (25) dólares.

"Artículo 2.—Esta ley empezará a regir el 1ro. de enero de 1974." 9 L.P.R.A. sec. 1155 (derogada).

El cuadro comparativo reseñado refleja que en nuestro país, distinto a lo ocurrido en otras jurisdicciones, la Asamblea Legislativa se ha expresado sobre esta medida de seguridad dándole un decisivo respaldo a la misma, hasta el punto de hacer su uso, como regla general, compulsorio.(15) Debe comprenderse que tal exigencia guarda correspondencia con un diseño legislativo de más alcance y sabiduría, encarnando una dualidad de propósitos: (1) la protección e integridad personal de los ocupantes de un vehículo; y (2) protección indirecta contra desembolsos excesivos en virtud de indemnizaciones al amparo de la "Ley de Protección Social por Accidentes de Automóviles" (A.C.A.A.), Núm. 138 de 26 de junio de 1968 (9 L.P.R.A. sec. 2051 *et seq.*).

■ Tal pronunciamiento plasmó y adelantó legislativamente un concepto que, según hemos visto, había encontrado eco en la lógica y razonamiento de algunos tribunales de otras jurisdicciones a través del concepto de "hombre prudente y razonable". No sólo por el respeto y deferencia que dicho mandato tiene sobre este foro, sino por las virtudes intrínsecas y efectividad del uso de los cinturones de seguridad, resolvemos que constituye negligencia la no utilización de los mismos—a menos que exista una de las excepciones estatuidas para su no uso, u otra circunstancia extraordinaria análoga a las contempladas en la ley—en la medida en que la parte demandada demuestre, en los hechos particulares del caso y mediante prueba competente, la existencia o no de rela-

---

(15) Al año 1972 en los Estados Unidos sólo tres jurisdicciones estaduales requerían por ley el uso de los cinturones de seguridad compulsoriamente, y ello en limitadas situaciones. En California al conductor y ocupante de un vehículo que se utilice para enseñar a manejar, Cal. Veh. Code, Sec. 27304 (Supp. 1970); en Minnesota a los conductores de autobuses escolares, Minn. Stat. Sec. 169.44(9) (Supp. 1970); por último, en Rhode Island a todos los conductores de autobuses y de vehículos de emergencia, R.I. Gen. Laws Ann. Sec. 31-33-41 (1948). Fischer, *The Medical and Legal Problems Arising From the Failure to Wear Seat Belts*, supra, pág. 131.

ción causal entre tal omisión y el daño sufrido: *Usera* v. *González*, 74 D.P.R. 487 (1953); *Pueblo* v. *Pereira*, 49 D.P.R. 891 (1936).

En el caso de autos no está en disputa que el automóvil de la demandante estaba equipado con los cinturones de seguridad y ella no los usaba al momento del accidente. No obstante lo expuesto, no podemos concurrir con la súplica del recurrente de que le imputemos a la reclamante negligencia comparada. El accidente ocurrió el 18 de febrero de 1973, antes de que en nuestro país se aprobaran las leyes respaldando esta medida de seguridad. Hasta dicha fecha, su uso era solamente voluntario y no existía una clara conciencia entre la ciudadanía de las virtudes del cinturón de seguridad. Es con la aprobación de la ley que el Estado comienza una campaña pública masiva para promoverlo, abarcando los medios de comunicación y la policía. Ante esta circunstancia, no es de justicia aplicar la norma al caso de autos.

### III

Discutamos en conjunto el tercero, cuarto y sexto señalamientos del demandado. En síntesis, básicamente se imputa como errores la aquilatación de la prueba respecto a la ocurrencia del accidente, la determinación sobre conexión causal entre las actuaciones del recurrente y el accidente y la estimación de daños en la suma de $20,000.00. En parte basa su contención en que el presente caso resulta similar al de *Lleras* v. *Tió*, 102 D.P.R. 180 (1974) y que allí se resolvió que no procedían daños por lesiones físicas.

No tiene razón. Hemos revisado toda la prueba y las circunstancias fácticas consideradas probadas por la ilustrada sala sentenciadora y encuentra apoyo la conclusión sobre relación causal y daños. No encontramos base que amerite nuestra intervención; más bien estamos frente a un caso donde de-

bemos dar fiel cumplimiento a la norma de abstención judicial.

Lo resuelto en el caso de *Lleras* v. *Tió*, supra, no es de aplicación al de autos. Allí la demandante sólo descansó en el testimonio de peritos que la atendieron *dos años después* del accidente para probar la conexión causal entre sus daños y el suceso, y no presentó prueba de tratamientos y exámenes médicos realizados durante el mencionado período. Ante tal situación, expresamos en lo pertinente:

"Hubiese sido de mayor peso y de más cercana relación entre el accidente y sus consecuencias si las demandantes hubiesen traído prueba de exámenes y de tratamientos realizados a raíz o poco después del accidente. Eso hubiese permitido al tribunal formar un juicio más probablemente correcto y más justo en relación con la alegada responsabilidad de los codemandados." 187.

En el que nos ocupa, por el contrario, la demandante en su testimonio describió los extensos exámenes y tratamientos a que fue sometida desde el otro día de ocurrido el accidente. Presentó prueba de una doctora especialista en fisioterapia, que tanto en el directo como en la repregunta demostró un conocimiento cabal de las lesiones y tratamiento de la recurrida, producto obviamente del estudio previo del récord de la paciente, al serle referida según la práctica común y ordinaria del ejercicio de la medicina. El hecho de que no hubiese producido los otros facultativos que la atendieron, no puede tener el efecto, como pretende el recurrente, de crear una presunción de que los otros médicos hubiesen aportado evidencia que perjudicaría su reclamación. Máxime cuando dichos peritos nunca acudieron al tribunal como testigos, ni fueron ofrecidos formalmente como tales. *Viera* v. *Arizmendi*, 74 D.P.R. 38 (1952). No podemos sancionar una norma que exija indefectiblemente en todo caso el desfile interminable de

galenos que de una forma u otra hayan intervenido con un paciente, cuando del testimonio de éste, unido al de uno de los facultativos principales, se reproduce ante el tribunal el cuadro clínico completo. No estamos ante un caso de mala práctica profesional (*malpractice*) en que los detalles sobre determinado tratamiento cobran una perspectiva de mayor relevancia y dimensión.

Excepto por la aplicación de la negligencia comparada, consideramos que no debemos alterar la cuantía de $20,000.00 adjudicada por los daños sufridos por la demandante. Entendemos que tal suma es adecuada a la luz de la prueba sobre daños presentada, no existiendo en este caso circunstancia que nos lleven a modificarla. *Urrutia* v. *A.A.A.*, 103 D.P.R. 643, 647–648 (1975).

También resulta improcedente el error sobre costas, gastos y $400.00 de honorarios de abogado e intereses sobre la sentencia de $20,000.00 desde el momento de la radicación. La parte demandada recurrente negó responsabilidad total en un caso en que prima facie era responsable en una proporción mayor.

Finalmente, la imposición de negligencia comparada exige que aclaremos la forma en que será computada judicialmente la exención de $1,000.00 provista en la Sec. 9 de la Ley de Protección Social por Accidentes de Automóviles (A.C.A.A., 9 L.P.R.A. sec. 2058(2)(a)). El apuntamiento no es académico, ya que dependiendo de la fórmula que rija, acrecentará o disminuirá la cuantía de una sentencia.

■■■ Nuestra jurisprudencia informa el carácter absoluto y automático de la exención de $1,000.00 por sufrimientos físicos y mentales, la cual favorece tanto al causante del accidente como a su asegurador: *Morales* v. *Lizarribar*, 100 D.P.R. 717 (1972). Ello lo apoya el texto de la ley que sobre el particular es claro y terminante: "[s]e eximirá de la apli-

cación del principio de responsabilidad a base de negligencia a toda persona que sea responsable, en virtud de un acto negligente de su parte, por daños o lesiones . . . [hasta] la cantidad de $1,000 . . . ." (9 L.P.R.A. sec. 2058(2)(a).) Por otro lado, esta sección provee en su inciso (e) que las reducciones ". . . se restarán de la *sentencia total a pagarse* . . . ." (Bastardillas nuestras.) Siendo así, forzoso es concluir que el cómputo a seguirse en casos de negligencia comparada es el de aplicar y calcular matemáticamente el por ciento de negligencia de la suma adjudicada en concepto de daños físicos y mentales, sin deducir en ese instante la exención de la ley que nos ocupa. Una vez obtenido ese resultado, procede entonces restar la deducción de $1,000.00. ([16])

En virtud de lo expuesto, *se dictará sentencia reduciendo la indemnización por daños físicos y morales de la demandante recurrida Camila Canales Velázquez a la suma de $14,000.00. Se confirmará en sus restantes extremos.*

El Juez Asociado Señor Díaz Cruz emitió opinión disidente a la cual se unen el Juez Presidente Señor Trías Monge y el Juez Asociado Señor Irizarry Yunqué.

---

([16]) Por vía ilustrativa, la operación matemática al caso de autos de la norma trazada es la siguiente:

| | |
|---|---:|
| (Daños) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $20,000.00 |
| (Menos cantidad de negligencia comparada 25%) . . . | 5,000.00 |
| ("Sentencia Total a Pagarse") . . . . . . . . . . . . . . . . . . . | $15,000.00 |
| (Menos exención de A.C.A.A. . . . . . . . . . . . . . . . . . . . | 1,000.00 |
| | $14,000.00 |

—0—

Voto disidente del Juez Asociado Señor Díaz Cruz al que se unen el Juez Presidente Señor Trías Monge y el Juez Asociado Señor Irizarry Yunqué.

San Juan, Puerto Rico, a 16 de octubre de 1978

Disiento porque no hay relación causal entre la falta de cinturón y el tipo de lesión (latigazo) sufrida por la demandante, que no se origina con la propulsión del cuerpo hacia el frente y los lados, sino por la reacción contraria que obedece a la ley de física: a toda acción sigue una igual y opuesta reacción.

Tampoco hay vínculo de causa y efecto entre el estallido (*blowout*) y la colisión, toda vez que según relata la opinión de mayoría cuando sobrevino el impacto, el vehículo de la demandante se hallaba ya en un carril libre de tránsito.

Los daños sufridos por la demandante fueron graves y grave también la negligencia de quien abandonó su carril para impactarla. La opinión mayoritaria le imputa 25% de culpa a la demandante por viajar con gomas desgastadas y para ello habría que inferir que fue ésa la causa del estallido (*blowout*). Aun así infiriendo, ya el estallido quedaba relegado a incidente remoto cuando el demandado chocó la parte posterior del vehículo de la demandante. Se había roto el hilo de causalidad por lo que el estallido no fue causa contribuyente del daño, ni próxima, ni eficiente, ni inmediata. No debe ella, por tanto, sufrir por tal concepto disminución alguna en la indemnización concedida que es modesta, considerando las consecuencias de impedimento físico y sufrimiento que conturba su existencia.