Miranda De Hostos, Juez Ponente
*1198 TEXTO COMPLETO DE LA SENTENCIA
Se recurre de una sentencia del Tribunal de Primera Instancia, Sala Superior de San Juan, en la que se declaró con lugar una demanda sobre hostigamiento sexual.
Inconforme con el pronunciamiento judicial, la parte apelante, el Estado Libre Asociado de Puerto Rico (ELA) y el Ledo. Hiram E. Cerezo (Comisionado) presentaron apelación, las cuales fueron consolidadas por tratarse ambos recursos sobre los mismos hechos.
En síntesis, se alega en ambos recursos que erró el tribunal de instancia: primero, al concluir que con la prueba presentada se establecieron los elementos de una causa de acción por hostigamiento sexual en su modalidad de ambiente hostil; segundo, que utilizó una norma incorrecta al evaluar la prueba y al darle credibilidad a la apelada cuando su testimonio era improbable e increíble; tercero, al descartar en su totalidad la prueba presentada por el Comisionado, otorgándole entera credibilidad a la parte apelada; cuarto, que no se le permitió al Comisionado presentar prueba admisible y pertinente a la controversia; quinto, que incidió el tribunal al valorar los daños; y sexto, que no procedía la concesión de honorarios de abogado. 
Luego de una evaluación de los alegatos de las partes y de la exposición estipulada de la prueba, se confirma la sentencia emitida por el tribunal de instancia, por los siguientes fundamentos.
I
Los hechos en el presente caso se resumen de la siguiente manera.
El 7 de abril de 1986, Milagros Pons (apelada) contrajo matrimonio con Rafael Iraola Padilla con quien procreó tres (3) hijos. (E.N.P., pág. 1). Como parte de su preparación académica, la apelada obtuvo un grado asociado en contabilidad en el Puerto Rico Junior College y había aprobado un curso d& "data entry".
*1199 Durante el mes de marzo de 1993 la apelada tenía un empleo temporero en las Oficinas Centrales del Citibank en Río Piedras en el cual devengaba $760.00 mensuales. Para esa fecha la misma contaba con veintinueve (29) años de edad. (E.N.P., pág. 1).
Para el año 1993 el apelante Hiram Cerezo Suárez se desempeñaba como Comisionado de Asuntos Municipales. Sus oficinas estaban localizadas en el mismo edificio en que estaban ubicadas las del Citibank. La apelada conocía con anterioridad al Comisionado pues habían sido vecinos cuando ambos residían en el Condominio Cobián Plaza de Santurce. (E.N.P., págs. 1-2).
En una ocasión en que las partes coincidieron almorzando en la cafetería de su edificio de trabajo, la apelada, luego de saludar al Comisionado, le inquirió sobre si había probabilidad de que ella pudiera conseguir trabajo en la Oficina del Comisionado de Asuntos Municipales (OCAM). El Comisionado le solicitó su résumé e indagó sobre el sueldo que ganaba en el Citibank. Posteriormente, en junio de 1993, la apelada se personó a la oficina del Comisionado y le entregó su résumé quien tras examinarlo le ofreció de inmediato un puesto como recopiladora de datos y le expresó que reservaría ese cargo hasta tanto ella hiciera los arreglos de salida de su antiguo empleo. (E.N.P., pág. 2).
El día 21 de junio de 1993 comenzó a trabajar como recopiladora de datos en la División de Asesoramiento de Asuntos Gerenciales y Fiscales bajo la supervisión del Sr. Carlos Santiago. (E.N.P., págs. 3 y 4). Su puesto era de carácter transitorio y tenía una duración del 23 de junio de 1993 al 31 de diciembre de 1993.
Transcurridos los primeros meses, en septiembre u octubre de 1993, la apelada notó cambios en la manera de actuar del Comisionado hacia ella. Este la miraba insistentemente en su lugar de trabajo, la piropeaba y le hacía comentarios sobre su apariencia física. A veces le hacía comentarios directos como: "me encanta tu pelo" y "quisiera meter mis manos por tu pelo". (E.N.P., pág. 4).
En varias ocasiones, el Comisionado le requirió a la apelada que lo acompañara en viajes oficiales a lo que ella no tenía otra alternativa que acceder. (E.N.P., pág. 5). En estos viajes el Comisionado hizo avances no deseados a la apelada quien tuvo que soportarlos para conservar su trabajo.
Con fecha de 28 de diciembre de 1993 el contrato de la apelada fue renovado por tres meses más, que vencían en marzo de 1994 o hasta que sus servicios fueran necesarios. Al comenzar el 1994 se asignó a la apelada a la División de Comunicaciones de OCAM que está localizada de manera contigua a la oficina propia del Comisionado y donde sólo trabajaban tres personas, el director de la División, Víctor Gregory, la Srta. Debbie Ruiz y la apelada. (E.N.P., pág. 5). Cabe destacar que entre las tareas de su puesto no estaba la de acompañar al Comisionado en los viajes oficiales a los municipios. Cuando realizaba esta labor, se dedicaba a tomar notas y a verificar que el Comisionado tuviera a mano todos los materiales que necesitaba.
Al principio la apelada disfrutaba de los viajes y se sentía halagada de acompañar al Comisionado en estas gestiones a las cuales, por lo general, acudían el chofer del mismo Hipólito Rivera, su empleado y amigo Víctor Gregory y a veces Debbie Ruiz. (E.N.P., págs. 17-18).
En marzo se le extendió nuevamente el nombramiento a la apelada hasta junio de 1994. En una ocasión en que las partes realizaron un viaje oficial a San Lorenzo y Gurabo, la apelada notó que el Comisionado la trataba de forma más dulce que otras veces. Al regresar, el Comisionado le indicó a la apelada que la conduciría hasta su auto que estaba en el estacionamiento de la OCAM y tan pronto como el chofer los dejó solos, éste la abrazó e intentó besarla. La apelada lo apartó y éste le comunicó que "Hace tiempo que quería estar contigo; tocarte; abrazarte. Pensé tanto en tí en el viaje a Oregon." Acto seguido la apelada entró en su auto y se marchó del lugar. (E.N.P., pág. 7).
Según la prueba presentada había veces en que el Comisionado la llamaba a su oficina para que ésta le hiciera compañía. Una vez allí, la tocaba y la acariciaba. Otras veces se sentaba frente a la apelada y tocaba sus partes íntimas mientras le profería que "la deseaba mucho" y "deseaba sentirla dentro de él." (E.N.P., pág. 10).
*1200 Con fecha de 24 de junio de 1994, el supervisor, Sr. Gregory, realizó una evaluación del trabajo de la apelada. Dicha evaluación reflejó que la misma sobrepasaba y alcanzaba los factores utilizados para medir su nivel de rendimiento. (E.N.P., pág. 8). Luego de discutir el contenido de la evaluación, la apelada y el supervisor firmaron el documento y posteriormente lo firmó el Comisionado extendiéndosele el nombramiento hasta septiembre de 1994. (E.N.P., pág. 8).
El 30 de junio de 1994 el Comisionado pidió a la apelada que lo acompañara a un viaje a Morovis y San Sebastián para el cual debía pernoctar. Durante la noche se reuniría con el Alcalde de Morovis en un juego de baloncesto y al día siguiente participaría en la actividad de certificación del Municipio de San Sebastián. (E.N.P., pág. 8).
En el vehículo oficial viajaron el Comisionado, Gregory, el chofer y la apelada. Partieron de la OCAM a las 4:00 P.M., asistieron al juego de baloncesto y a las 11:00 P.M. salieron hacia Aguadilla a buscar alojamiento en el Hotel Cielo Mar. (E.N.P., págs. 8-9). Allí el Comisionado reservó tres habitaciones, una para la apelada, otra para Gregory y el chofer Rivera y la tercera para su uso personal. Una vez en el tercer piso del hotel se dieron cuenta que la habitación de Gregory y Rivera sólo tenía una cama por lo que los reubicaron en el segundo piso. Las habitaciones del Comisionado y la apelada eran contiguas y no había ninguna puerta que las conectara.
Según la prueba desfilada, el Comisionado entró en la habitación de la apelada para inspeccionarla y ver si todo estaba bien. Después se retiró a su cuarto y la apelada aprovechó para bañarse. Al salir del baño se dio cuenta que el Comisionado estaba en su habitación y a pesar de que ésta inicialmente se resistió, el Comisionado tuvo acceso carnal con ella y luego se fue a su cuarto. La apelada permaneció en su habitación y se sentía intimidada, ya que se trataba del jefe de la agencia. (E.N.P., pág. 9).
En un viaje oficial a Naguabo, mientras viajaban en el auto oficial, el Comisionado se acercó y colocó su brazo por los hombros de la apelada y le acarició la espalda. (E.N.P., pág. 9).
Otra situación surgió cuando la apelada acompañó al Comisionado al sepelio del padre de una de las empleadas de OCAM a celebrarse en Castañer. Al regresar de este acto el chofer se dirigió al estacionamiento de la OCAM y se bajó del auto. El Comisionado le pidió a la apelada que lo acompañara a dar un paseo. Así las cosas, condujo hasta Santurce y detuvo el auto frente al Banco Popular ubicado en la Avenida Ponce de León. Dejó el carro encendido, se dirigió a una máquina ATH y luego cruzó la avenida para usar un teléfono público aunque tenía teléfono celular en el auto. A todo esto, la apelada se mantuvo en el automóvil observando los actos del Comisionado. Al regresar, éste condujo hasta el Hotel Excelsior, le indicó a la apelada que lo esperara frente al restaurante Augusto's y se dirigió al área de registro. Posteriormente subió con la apelada hasta el piso 10. Una vez en la habitación 1012, la apelada entró, el Comisionado se le acercó y sostuvieron relaciones sexuales. Salieron de la habitación a las 7:15 P.M. y el Comisionado la llevó hasta el estacionamiento de la OCAM donde ella había dejado su auto. (E.N.P., págs. 10-11).
De acuerdo a la evidencia aportada, desde fines de 1993, la apelada había estado experimentando problemas en,su matrimonio. En noviembre, su esposo abandonó el hogar pero regresó en diciembre. Sin embargo, en junio de 1994 volvió a abandonar el hogar hasta regresar nuevamente en julio. (E.N.P., pág. 14). Fue entonces cuando la apelada le relató a su esposo todo lo sucedido con el Comisionado, situación que puso punto final al matrimonio. La apelada le informó al Comisionado que había hablado con su esposo sobre su conducta a lo que el Comisionado respondió airado: "¿Por qué se lo dijiste? Tu sabes en los problemas que me has metido; ahora me van a poner un detective." (E.N.P., pág. 14).
Luego de este incidente, la apelada se fue de vacaciones y tomó varios días cargados a su licencia por enfermedad y al tiempo compensatorio. El 15 de septiembre de 1994 se le notificó que no sería renovado su contrato y posterior a esa fecha el 23 de septiembre de 1994, su supervisor efectuó una evaluación y concluyó que la apelada no dominaba las tareas que realizaba y que ya no era eficiente. Tres meses antes, ella había sobrepasado el estándar requerido para realizar su trabajo. Su supervisor no discutió con ella la evaluación como era la norma. (E.N.P., pág. 12).
*1201 En octubre de 1994 la apelada regresó a trabajar con Citibank pero renunció debido a problemas emocionales. (E.N.P., pág. 15). Luego estuvo en dos empleos temporeros y a la fecha del juicio estaba en período probatorio en la empresa Cortelco.
El 4 de octubre de 1994 la apelada presentó una querella por alegado hostigamiento sexual contra el Comisionado ante el Tribunal de Primera Instancia, Sala Superior de San Juan. Sostuvo la apelada que por el acceso sexual y por no renovársele su contrato sufrió ansiedad y angustia, se afectó su relación con sus hijos y se destruyó su matrimonio, pues su esposo abandonó el hogar finalmente. Tuvo que mudarse a casa de su madre y matricular a los niños en una escuela pública. Según la prueba pericial, la apelada desarrolló síntomas como insomnio, pérdida de memoria, sentimientos de inseguridad y se le indicó que tanto ella como sus hijos necesitaban tratamiento terapéutico. El Secretario de Justicia ordenó una investigación y la asesora legal del Comisionado concluyó en su informe que no había prueba que corroborara el testimonio de la apelada.
El tribunal de instancia, luego del trámite correspondiente y al celebrar una vista en sus méritos el 27 de marzo de 1996, declaró con lugar la reclamación por hostigamiento sexual y condenó al ELA y al Comisionado a pagar solidariamente a la apelada la suma de $200,000.00, más $15,000.00 por concepto de honorarios de abogado.
De esta determinación recurren ante nos el Comisionado y el ELA, mediante el presente recurso de apelación.
II
A la luz de los hechos antes esbozados, analicemos el derecho aplicable al caso de autos. Con respecto a los primeros tres errores por estar relacionados, serán discutidos en conjunto.
La Constitución del Estado Libre Asociado en su Carta de Derechos, Art. II, Sec. 1, establece que la dignidad del ser humano es inviolable y que todas la personas son iguales ante la ley. Se consagra como principio fundamental, el derecho de toda persona a la protección contra ataques abusivos a su honra, reputación y vida privada o familiar. Art. II, Sec. 8, supra.
Para poner en vigor dicho mandato constitucional se ha legislado para proveer a los empleados los recursos necesarios para protegerlos de prácticas discriminatorias en el empleo entre las que se encuentran la Ley Núm. 17 de 22 de abril de 1988, 29 L.P.R.A. see. 155 et. seq., la cual como parte de su política pública prohibe el hostigamiento sexual en el empleo e impone penalidades a quienes cometan o permitan tal conducta. La Exposición de Motivos de dicha ley establece que "[l]a práctica del hostigamiento sexual en el empleo, en cualquiera de sus formas, infringe la inviolabilidad del ser humano y constituye un claro discrimen contra el hombre o la mujer en el campo del trabajo." La Asamblea Legislativa en el Art. 3 de la Ley Núm. 17, 29 L.P.R.A. sec. 155(b), define el hostigamiento sexual como:
El hostigamiento sexual en el empleo consiste en cualquier tipo de acercamiento sexual no deseado, requerimientos de favores sexuales y cualquier otra conducta verbal o física de naturaleza sexual, cuando se da una o más de las siguientes circunstancias:

"(a) Cuando el someterse a dicha conducta se convierte de forma implícita o explícita en un término o condición del empleo de una persona.

(b) Cuando el sometimiento o rechazo a dicha conducta por parte de la persona se convierte en fundamento para la toma de decisiones en el empleo o respecto del empleo que afectan a esa persona.

(c) Cuando esa conducta tiene el efecto o propósito de interferir de manera irrazonable con el desempeño del trabajo de esa persona o cuando crea un ambiente de trabajo intimidante, hostil u ofensivo."

Cónsono con tales principios nuestro más alto foro ha reconocido que el hostigamiento sexual en el empleo constituye una modalidad de discrimen por razón de sexo. Rodríguez v. Supermercado Amigo, opinión de 24 de abril de 1990, 90 J.T.S. 50, pág. 7649.
*1202 Por su parte, la Ley que prohíbe el hostigamiento sexual dispone que el patrono tendrá responsabilidad absoluta de sus actos y los de sus supervisores y agentes, independientemente del conocimiento del hostigamiento o de que haya prohibido el mismo. Art. 5, supra, 29 L.P.R.A. sec. 155d.
La jurisprudencia en la jurisdicción federal citada como autoridad por nuestro Tribunal Supremo ha distinguido dos modalidades en que puede manifestarse el hostigamiento sexual en el empleo, éstas son; hostigamiento sexual por ambiente hostil; y el hostigamiento equivalente quid, pro quo, los cuales en lo pertinente serán definidos a continuación. Rodríguez v. Supermercado Amigo, supra, pág. 7652; Meritor Savings Bank v. Michelle Vinson, 91 L. Ed. 2d 49, 59-60 (1986).
Se ha reconocido que la primera modalidad por ambiente hostil se recoge en el inciso (c) y el de hostigamiento equivalente quid pro quo en los incisos (a) y (b) del Art. 3, supra, 29 L.P.R.A. sec. 155 (b). Delgado Zayas v. Hospital Interamericano, opinión de 5 de diciembre de 1994, 94 J.T.S. 149, pág. 501.
El ambiente hostil es producido "[cjuando la conducta sexual para con un individuo tiene el efecto de interferir irrazonablemente con el desempeño de su trabajo o de crear en el mismo un ambiente intimidante, hostil u ofensivo." Rodríguez v. Supermercado Amigo, supra. Se debe examinar si la alegada conducta es lo suficientemente severa y ofensiva como para alterar las condiciones del empleo o crear un ambiente de trabajo abusivo. No se requiere que dicha conducta produzca un daño económico y que sea de naturaleza explícitamente sexual.
La ley en contra de esta mala práctica requiere que este examen se realice de acuerdo a la totalidad de las circunstancias de cada caso en particular. Art. 4, supra, 29 L.P.R.A. sec. 155(c). Se deben tomar en cuenta varios factores que pueden denotar este comportamiento como la naturaleza de la conducta alegada, la frecuencia e intensidad de la misma, en qué contexto ocurren y su duración, las circunstancias personales del demandante, el daño psicológico sufrido, entre otros factores importantes. Delgado Zayas v. Hospital Interamericano, supra.
De otro modo, la modalidad de hostigamiento sexual equivalente quid pro quo, surge cuando el someterse o rechazar los avances sexuales es tomado como base para afectar beneficios en el empleo. El demandante debe probar que el someterse o rechazar tal conducta fue la causa de una decisión adversa sobre su empleo. Rodríguez v. Supermercado Amigo, supra. Se ha establecido en esta modalidad que el que alegue haber sido hostigado debe establecer que tal conducta no fue deseada. No obstante, el hecho de que la parte afectada no hubiera sido forzada u obligada a participar de una relación sexual con el alegado hostigador, no constituye una defensa en un caso de esta naturaleza ni significa que la víctima haya deseado la relación.
Para sostener que la conducta sexual no fue deseada y es lo suficientemente severa y ofensiva para crear un ambiente de trabajo abusivo hay que probar, a la luz de la totalidad de las circunstancias, que la misma ocurrió durante horas en que se llevaban a cabo las funciones de empleo, la frecuencia e intensidad, contexto en que ocurren, período de tiempo y la conducta y circunstancias personales del demandante. Esto crea una presunción rebatible de que la conducta no fue deseada, que el despido fue por razón de discrimen y le corresponde entonces al demandado, destruir la misma mediante preponderancia de prueba. Rodríguez v. Supermercado Amigo, supra; Ibañez v. Molinos de P.R., Inc., 114 D.P.R. 42, 53 (1983).
III
En atención a las doctrinas de derecho antes señaladas resolvemos que no incidió el tribunal de instancia al dictar su sentencia conforme la pmeba que tuvo ante su consideración por lo siguiente.
Surge de la totalidad de la prueba presentada y creída por el juzgador de hechos que mientras la apelada trabajaba en la OCAM, el Comisionado le hacía comentarios de connotación sexual que culminaron en el punto de lograr sostener relaciones sexuales con la apelada. Este acoso fue producto de la relación jefe y empleado, pues el Comisionado conocía que la apelada tenía hijos que educar y necesitaba permanecer en su empleo, que por ser de carácter transitorio, estaba en sus manos el *1203 renovarlo.
El Comisionado utilizó su posición para crear un ambiente hostil e intimidante en el área de trabajo de la apelada. Inclusive utilizó el vehículo oficial y la oficina destinada para su uso personal por el gobierno para realizar tal conducta, llevándose a la apelada a diferentes lugares de la isla bajo el ardid de que sólo eran viajes relacionados con el trabajo, cuando en realidad lo que pretendía era tenerla cerca para acosarla sexualmente a sabiendas de que ella no lo delataría por temor a perder su empleo.
De otra parte, surge de la prueba presentada que cuando el Comisionado se enteró que la apelada le comunicó a su esposo lo sucedido, dio por terminado el contrato de empleo transitorio y lo trató de justificar con una evaluación negativa, cuando las evaluaciones previas sobrepasaban el estándar requerido. Esta actuación del Comisionado que a todas luces era una represalia por lo ocurrido, provocó que la apelada quedara desprovista de medios económicos para su sustento y el de sus hijos, lo que le creó un estado de depresión y ansiedad.
En atención a lo anterior, resolvemos que la apelada estableció un caso de hostigamiento sexual en la modalidad de ambiente hostil. Le correspondía al Comisionado demostrar que había una relación deseada y consentida por la apelada o que el despido de la misma no se debió a razones discriminatorias. El Comisionado se limitó a negar rotundamente lo acontecido, sin más prueba que su testimonio en corte abierta al cual el tribunal de instancia no le dio credibilidad alguna. En ausencia de prueba sobre tales extremos concluimos que no incidió el tribunal de instancia al resolver que hubo hostigamiento sexual contra la apelada, por lo cual los primeros tres errores señalados no fueron cometidos.
IV
Referente al cuarto error, tampoco incidió el tribunal de instancia, al no admitir el testimonio de Linnette Falcón, ex-esposa del Comisionado, ya que el mismo no se anunció en el Informe de Conferencia con Antelación al Juicio y el tribunal había sido enfático al señalar que el acta y el informe regularían el proceso el día del juicio. Además, su testimonio estaba dirigido a demostrar que alegadamente la apelada consintió a los actos; defensa que no se había levantado previamente, por lo cual era sorpresiva.
Por otra parte, siendo la teoría de ambas apelantes la negación total de los hechos declarados por la apelada, dicha prueba era impertinente además de contradictoria y no hubiese desvirtuado el resultado final del caso.
V
Sobre el quinto señalamiento de error, de la valoración de los daños hecha por el tribunal sentenciador, resolvemos que no fue cometido. La valoración de daños es una gestión "[d]ificily angustiosa, no existiendo un sistema mecánico que nos permita llegar a un resultado exacto..." Rodríguez Cancel v. A.E.E., 116 D.P.R. 443, 451 (1985). Aquel que impugne la suma de los daños impuestos por el foro sentenciador debe probar las circunstancias que hagan meritorio el modificarla. Vélez Rodríguez et. al. v. Amaro Cora, opinión de 10 de abril de 1995, 95 J.T.S. 38, pág. 759; Canales Velázquez v. Rosario Quiles, 107 D.P.R. 757 (1978).
El tribunal de instancia, por estar en contacto directo con la prueba, está en mejor posición de evaluar los daños. Sólo se intervendrá con la cuantía concedida si el apelante demuestra que la cantidad concedida fue exageradamente alta o ridiculamente baja. Toro Aponte v. E.L.A., opinión de 31 de enero de 1997, 97 J.T.S. 18, pág. 629; Riley v. Rodríguez de Pacheco, 119 D.P.R. 762, 805 (1987). (Casos citados).
En el presente caso el tribunal tuvo ante sí el relato de unos actos de hostigamiento sexual que conllevaron que la apelada perdiera su empleo y que se afectara su vida personal, emocional y familiar y la de sus hijos. A base de la prueba, el foro de instancia estaba en mejores condiciones de adjudicar los daños y sufrimientos mentales de que fue objeto la apelada. Por lo que concluimos que a la luz de la política pública del estatuto que prohibe el hostigamiento sexual, entendemos que no existe prueba que nos permita determinar que hubo abuso de discreción al imponer la cuantía de daños.
*1204 VI
En cuanto a la partida por honorarios de abogado, el propio estatuto dispone que la parte que resulte responsable por incurrir en la conducta prohibida de hostigamiento sexual, deberá satisfacer los honorarios de abogado y las costas del procedimiento. 29 L.P.R.A. sec. 155(k). Por tanto, el tribunal de instancia venía obligado a imponerlos a la parte perdidosa en el pleito por disposición de ley.
No existiendo prueba que demuestre abuso de discreción por parte del tribunal de instancia en la cantidad fijada por concepto de honorarios de abogado, nos abstenemos de intervenir con la misma. Cotto Morales v. Calo Ríos, opinión de 17 de abril de 1996, 96 J.T.S. 56, pág. 997; Ramírez v. Club Cala de Palmas, 123 D.P.R. 339, 350 (1989). (Casos citados.)
VII
Por último es norma reconocida que en ausencia de error manifiesto, pasión, prejuicio o parcialidad debemos abstenernos de intervenir con la apreciación de la prueba que haga el tribunal de instancia. Monllor Arzola v. Sociedad de Gananciales, opinión de 13 de junio de 1995, 95 J.T.S. 77, pág. 963; Rivera Pérez v. Cruz Corchado, 119 D.P.R. 8, 14 (1987).
Se ha resuelto que en casos donde el planteamiento primordial se dirige a la credibilidad de los testigos existe una gran deferencia a lo resuelto por el tribunal de instancia, pues éste goza de la oportunidad de ver y escuchar directamente a los testigos y dirimir conflictos de prueba. Quiñones López v. Manzano Pozas, opinión de 25 de junio de 1996, 96 J.T.S. 95, pág. 1305; Ortiz v. Cruz Pabón, 103 D.P.R. 939, 947 (1975).
En su sentencia, el tribunal de instancia en el descargo de su responsabilidad adjudicativa, consignó de manera detallada el testimonio de la apelada al cual le dio entera credibilidad. De una lectura de la exposición estipulada de la prueba según nos fue presentada, vemos que la prueba desfilada y creída por la juzgadora de instancia sostiene las determinaciones de hechos que ésta hiciera, por lo cual concluimos que su actuación fue correcta en derecho.
VIH
Por los anteriores fundamentos se confirma la sentencia dictada por el tribunal de instancia.
Lo acordó y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 97 DTA 84
1. Por estar repetidos algunos de los errores señalados por las partes apelantes en particular sobre el valor probatorio de la prueba presentada, hemos procedido a consolidarlos y a resumirlos a los fines de su discusión.
2. Según la prueba desfilada, el Comisionado se registró bajo el nombre de Carlos García Hernández y consignó una dirección de Mayaguez, su lugar de origen.