ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| YAMELIS OCASIO VÉLEZ<br><br>APELADA<br><br>V.<br><br>AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS Y MAPFRE PRAICO INSURANCE COMPANY, ET AL<br><br>APELADOS | KLAN202500333 | *APELACIÓN* procedente del Tribunal de Primera Instancia Sala de Bayamón<br><br>Caso Núm. BY2023CV4494<br><br>Sobre: Daños y Perjuicios |

Panel integrado por su presidenta, la juez Brignoni Mártir, la jueza Alvarez Esnard, y la jueza Prats Palerm

Brignoni Mártir, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 23 de septiembre de 2025.

Comparece la Autoridad de Acueductos y Alcantarillados (AAA o la Apelante) y solicita la revocación de la *Sentencia* emitida el 24 de febrero de 2024, por el Tribunal de Primera Instancia, Sala de Mayagüez (TPI o foro primario), notificada el 25 de febrero de 2025. Mediante la referida Sentencia el foro primario, declaró *Con Lugar* la Demanda en daños y perjuicios presentada en su contra por Yamelis Ocasio Vélez (señora Ocasio Vélez o la Apelada) y condenó a la AAA, a Mapfre Praico Insurance Company (MAPFRE) y al Municipio de Bayamón, a satisfacer a la Apelada solidariamente, la suma de sesenta y cinco mil dólares ($65,000.00), más las costas incurridas por esta en la tramitación del pleito.

Por los fundamentos que expondremos a continuación, confirmamos la *Sentencia* apelada.

**I.**

Por hechos ocurridos el 27 de abril de 2023, el 14 de agosto de ese año la señora Ocasio Vélez presentó Demanda en daños y perjuicios en

contra de la AAA y de MAPFRE.[1] En síntesis, la Apelada alegó que se encontraba caminando por la acera de la Avenida Los Millones en el Municipio de Bayamón y cayó en un contador de la AAA que se encontraba abierto, sin tapa, por lo que sufrió daños físicos y emocionales que estimó en ciento veinte mil dólares ($120,000.00.).

En respuesta, el 11 de octubre de 2023, la AAA y MAPFRE presentaron *Contestación a Demanda.*[2] En síntesis, señalan que la AAA carece de jurisdicción sobre la estabilidad y mantenimiento de las aceras y que dicha responsabilidad de las aceras le corresponde al Municipio de Bayamón. Razona la AAA que las tapas y planchas de metal instaladas en las aceras pasan a ser parte de la superficie de la acera por donde transita a pie el público. De igual forma, arguye la Apelante que los daños reclamados obedecen a la falta de cuidado de la Apelada, que esta dejó de mitigar daños y que la suma reclamada es exagerada. Entre sus defensas afirmativas, la AAA sostiene que la acción en contra de la AAA está prescrita y que la demanda deja de exponer una reclamación que justifique la concesión de un remedio.

De igual forma, por los mismos hechos, el 17 de octubre de 2023, la AAA y MAPFRE presentaron *Demanda contra Tercero* en contra del Municipio de Bayamón, y el Estado Libre Asociado de Puerto Rico (ELA) a través del Departamento de Transportación y Obras Públicas (DTOP).[3] Por su parte, el 13 de noviembre de 2023, el Municipio de Bayamón presentó *Contestación a Demanda contra Terceros.*[4] En síntesis, sostiene el Municipio de Bayamón que la entidad municipal no posee tapas de contadores de agua y que la demanda contra tercero deja de exponer una reclamación que justifique la concesión de un remedio.

Posteriormente, el 2 de febrero de 2024, el Municipio de Bayamón presentó *Moción Solicitando Permiso para Incluir Reconvención.* Allí expuso que en el lugar del accidente se encontraban dos huecos sin tapa

---

[1] *Véase* páginas 1-3 del Apéndice de la *Apelación*.
[2] *Véase* páginas 4-12 del Apéndice de la *Apelación*.
[3] *Véase* páginas 13-16 del Apéndice de la *Apelación*.
[4] *Véase* páginas 26-28 del Apéndice de la *Apelación.*

pertenecientes a contadores de la propiedad de la AAA y que el Municipio de Bayamón no es propietario, ni tiene bajo su responsabilidad el cuidado, mantenimiento y reparaciones de los contadores de agua que son propiedad exclusiva de la AAA.[5]

En el interín, el 28 de febrero de 2024, la AAA y MAPFRE presentaron *Solicitud de Desistimiento sin Perjuicio a favor del ELA/DTOP*.[6] A esos fines, el 29 de febrero de 2024, el foro primario emitió *Sentencia Parcial,* notificada el 1 de marzo de 2024, en la que declaró Ha Lugar la *Solicitud de Desistimiento sin Perjuicio a favor del ELA/DTOP* presentada por la AAA y MAPFRE y dio por desistida a dicha parte sin perjuicio.[7]

Acto seguido, el 1 de marzo de 2024, el Municipio de Bayamón presentó *Moción en Cumplimiento de Orden sobre Reconvención omitida y Enmienda a Contestación*.[8] Allí alegó que la AAA es la titular de los contadores localizados en la acera de la Avenida Los Millones y la única responsable por el cuidado, mantenimiento y limpieza de dichos contadores, los cuales se encontraban descubiertos, sin tapas y cubiertos de yerba. Sostiene, además, que el accidente que motiva la demanda se debió igualmente a la negligencia de la señora Ocasio Vélez quien venía hablando por teléfono móvil y no vio los contadores y a la negligencia de la AAA por no prestar mantenimiento a los mismos. En respuesta, el 15 de abril de 2024, la AAA presentó *Contestación a Reconvención a Demanda contra Tercero presentada por el Municipio de Bayamón*.[9]

Tras varios trámites procesales, el 13 de agosto de 2024 las partes presentaron *Informe Sobre Conferencia con Antelación al Juicio* en el que estipularon los siguientes hechos:

### ESTIPULACIONES DE LAS PARTES

1. Los hechos materiales de este caso se desarrollaron el día 27 de abril de 2023.
2. Los hechos materiales de este caso se desarrollaron a las 12:00 p.m.

---

[5] *Véase* páginas 35-36 del Apéndice de la *Apelación*.
[6] *Véase* páginas 37-38 del Apéndice de la *Apelación*.
[7] *Véase* páginas 39-40 del Apéndice de la *Apelación*.
[8] *Véase* páginas 41-43 del Apéndice de la *Apelación*.
[9] *Véase* páginas 44-52 del Apéndice de la *Apelación*.

3. Los hechos materiales de este caso se desarrollaron en el Municipio de Bayamón.

4. Para la fecha de los hechos la parte demandante tenía 43 años.

5. Para la fecha de los hechos de este caso la parte demandante residía en Bayamón.

6. Para la fecha de los hechos de este caso el estado civil de la parte demandante era casada.

7. Para la fecha de los hechos la parte demandante trabajaba en una oficina dental.

8. Se estipula la capacidad del Dr. Omar Gómez para fungir como perito de impedimento en el presente caso.

9. **Para la fecha de los hechos materiales de este caso MAPFRE PRAICO Insurance Company mantenía en vigor una póliza de responsabilidad pública a favor y en beneficio del Municipio de Bayamón**.

10. Se estipulan los términos, condiciones, límites y exclusiones de la póliza de responsabilidad pública que para la fecha de los hechos mantenía en vigor MAPFRE PRAICO Insurance Company a favor y en beneficio del Municipio de Bayamón.

11. Para la fecha de los hechos materiales de este caso MAPFRE PRAICO Insurance Company mantenía en vigor una póliza de responsabilidad pública a favor y en beneficio de la Autoridad de Acueductos y Alcantarillados (AAA).

12. Se estipulan los términos, condiciones, límites y exclusiones de la póliza de responsabilidad pública que para la fecha de los hechos mantenía en vigor MAPFRE PRAICO Insurance Company a favor y en beneficio de la Autoridad de Acueductos y Alcantarillados (AAA).

13. **La Avenida Millones está bajo el control y la jurisdicción del Municipio de Bayamón.**

14. **Por los hechos materiales de este caso la parte demandante recibió atención médica a través de la CFSE.**

15. **La caja del contador en el que se alega que cayó la demandante pertenece a la AAA**. [10]

El 16 de agosto de 2024, se celebró la Conferencia con Antelación al Juicio.[11] Durante dicho evento procesal las partes informaron al foro primario haber alcanzado las siguientes estipulaciones en cuanto a los documentos anunciados en evidencia:

1. Exhibit 1 Estipulado (A-C), Tres (3) fotografías del lugar de los hechos.

2. Exhibit 2 Estipulado (A-F), Seis (6) fotografías del lugar del accidente.

3. Exhibit 3 Estipulado, Expediente médico de la parte demandante para la CFSE. (25 folios). [12]

Al día siguiente, el 17 de agosto de 2024, las partes presentaron *Moción Enmendando Informe sobre Conferencia con Antelación al Juicio en cuanto al Derecho aplicable de la Autoridad de Acueductos y Alcantarillados*.[13] Sobre estos extremos, el 19 de agosto de 2024, el foro primario emitió *Orden*, notificada el 22 de agosto de 2024 a los fines de

---

[10] *Véase* páginas 53-69 del Apéndice de la *Apelación*.
[11] *Véase* páginas 79-80 del Apéndice de la *Apelación*
[12] *Id.*
[13] *Véase* páginas 71-78 del Apéndice de la *Apelación*.

adoptar el *Informe Sobre Conferencia con Antelación al Juicio* como el acta que habría de regir los procedimientos del Juicio en su Fondo.[14]

Tras varios incidentes procesales, se celebró el Juicio en su Fondo. La prueba oral presentada por la señora Ocasio Reyes consistió en su testimonio y del testimonio del perito, Dr. Omar Gómez Medina. Por su parte, la AAA presentó el testimonio del Sr. Luis A. Heil Salgado. El Municipio de Bayamón presentó el testimonio del Sr. Juan C. Hernández González, Director del Departamento de Obras Públicas. Sobre el testimonio del testigo presentado por el Municipio de Bayamón, es preciso destacar que el foro primario tomó la determinación de no permitir que este aludiera en su testimonio a una Certificación que pretendía establecer que la jurisdicción de la Avenida Los Millones era jurisdicción estatal y no municipal. Dicha determinación del TPI obedeció a que anteriormente el Municipio de Bayamón había admitido como suya la jurisdicción de la acera de la Avenida Los Millones, lo que llevó a la AAA a desistir de su reclamación en contra del ELA por lo que el foro primario tampoco permitió la presentación de la Certificación.[15]

Mediante *Sentencia* emitida el, 24 de febrero de 2025, notificada al día siguiente, el foro primario declaró Con Lugar la Demanda en daños presentada por la señora Ocasio Vélez y condenó a la AAA, a MAPFRE y al Municipio de Bayamón, a satisfacer a la Apelada solidariamente, la suma de sesenta y cinco mil dólares ($65,000.00), más las costas incurridas por esta en la tramitación del pleito. En dicha Sentencia, conforme a la prueba desfilada, el TPI advino a las siguientes determinaciones de hechos:

### DETERMINACIONES DE HECHOS

1. Yamelis Ocasio, de 46 años, reside en la Urbanización Santa Elena en Bayamón con su esposo y su hijo de 15 años.
2. La demandante se gana la vida como auxiliar de sistema de oficina.
3. Previo a los hechos materiales de este caso la demandante había sido intervenida quirúrgicamente en dos ocasiones.
4. La demanda que motiva este trámite judicial es la primera reclamación judicial interpuesta por la señora Ocasio.

---

[14] *Véase* Entrada Núm. 53 de SUMAC.
[15] Véase Entrada Núm. 83 de SUMAC.

5. El 27 de abril de 2023, entre las 11:00 a.m. y las 12:00 p.m., la señora Ocasio sufrió una caída en la Avenida Los Millones en Bayamón, frente a la Oficina Morales Dental Care, donde trabajaba como supervisora de personal de servicios de salud.

6. Ese día, la señora Ocasio llegó a la oficina alrededor de las 9:00 a.m. después de salir de su casa a las 8:50 a.m.

7. El día de los hechos la demandante vestía ropa de oficina, calzaba zapatos planos, y llevaba consigo un par de gafas para leer.

8. Al llegar a su trabajo la demandante estacionó su auto en retroceso en una zona de carga al lado de la oficina, que estaba designada para el personal, y se dirigió a la entrada, pasando entre su vehículo y la línea amarilla que delimitaba el área de estacionamiento.

9. **Alrededor de las 11:00 a.m., la señora Ocasio salió de la oficina para buscar unos artículos que había dejado en su auto**.

10. **Mientras caminaba hacia su auto la demandante llevaba los documentos en su brazo izquierdo y hablaba por teléfono con un suplidor.**

11. **En esta ocasión, no pudo pasar por detrás del vehículo que estaba estacionado en el área de carga porque estaba muy cerca de la línea amarilla.**

12. **<u>Al caminar entre la línea amarilla y su vehículo, mirando hacia el frente, su pie derecho cayó en un contador sin tapa que estaba en el suelo, y perdió el equilibrio, cayendo sobre su lado derecho.</u>**

13. **La demandante no había visto el contador antes de caer, y se percató de su presencia y que no tenía tapa cuando ya estaba en el suelo.**

14. **<u>El contador estaba ubicado frente a la oficina, y estaba lleno de vegetación.</u>**

15. Al caer al suelo, la demandante se golpeó la cadera, el tobillo derecho y el codo derecho, y su teléfono y los documentos que llevaba en la mano salieron volando.

16. Después de la caída, la señora Ocasio permaneció en el suelo durante diez minutos, sin poderse levantar debido al dolor.

17. La demandante se incorporó poco a poco y regresó a la oficina; allí, llamó al dueño de la oficina para informarle sobre el accidente, pero él no la dejó ir a la sala de emergencias.

18. Ante la negativa de su patrono, la demandante continuó trabajando con dolor intenso e hinchazón en el tobillo.

19. Al final de la jornada laboral, alrededor de las 5:30 p.m., la demandante llamó a recursos humanos para notificarles sobre el accidente y la negativa del dueño de permitirle buscar atención médica; la representante de recursos humanos le recomendó que fuera a la sala de emergencias.

20. Al salir de su trabajo, alrededor de las 6:00 p.m., la demandante se dirigió a la sala de emergencias de Metro Pavía en Bayamón.

21. En la referida institución médica, la demandante fue evaluada y se le tomaron radiografías del codo derecho, la cadera y el tobillo derecho; además, se le administraron medicamentos para el dolor.

22. El dolor que la demandante sentía en las áreas afectadas era tan intenso que comenzó a llorar.

23. Después de dos horas en la sala de emergencias, la señora Ocasio regresó a su casa en automóvil.

24. Esa noche la demandante no pudo dormir debido al dolor en la cadera y la pierna, esto a pesar de los medicamentos que le habían administrado; además, la demandante estaba preocupada por el impacto que el accidente tendría en su persona.

25. El 5 de mayo de 2023, la demandante fue evaluada por la Dra. Cynthia González en la Corporación del Fondo del Seguro del Estado (CFSE).

26. La doctora González diagnosticó contusiones en el tobillo derecho y el pie izquierdo, así como esguinces cervicales y lumbares.

27. En la CFSE le administraron a la demandante Toradol y Decadron intramusculares, le ordenaron radiografías y le recomendaron tratamiento con Norflex y Medrol.

28. El 26 de mayo de 2023, la demandante fue evaluada por el Dr. Juan Maldonado-Saravia en la CFSE.

29. El doctor Maldonado diagnosticó trauma en el pie izquierdo, la cadera derecha y el tobillo derecho, así como esguinces cervicales y lumbares; ante estos diagnósticos el galeno recomendó tratamiento con Nabumetone y Chlorzoxazone.

30. El 21 de junio de 2023, la señora Ocasio fue evaluada por la Dra. Nancy Alicea, fisiatra, quien diagnosticó radiculitis lumbosacra derecha y esguince cervicodorsal.

31. En consideración de sus hallazgos la fisiatra recomendó siete sesiones de terapia física, que incluyeron compresas calientes, ultrasonido, estimulación eléctrica, masajes y ejercicios terapéuticos.

32. El 10 de julio de 2023, la demandante fue evaluada por la Dra. Rhina M. Calderón-Vargas en la CFSE, quien diagnosticó trauma en la cadera derecha, el pie izquierdo y el tobillo derecho, así como esguinces cervicales y lumbares.

33. La doctora Calderón recomendó tratamiento con Orphenadrine y Diclofenac.

34. El 8 de agosto de 2023, la señora demandante fue reevaluada por la Dra. Calderón; en esta reevaluación la doctora confirmó los mismos diagnósticos de traumas y esguinces.

35. El 18 de diciembre de 2023, la demandante fue evaluada por el Dr. Omar Gómez Medina, perito de la parte demandante.

36. Ante el perito la demandante se quejó de dolor lumbosacral, dolor en la cadera derecha y dolor en el codo derecho.

37. **El doctor Gómez determinó que la señora Ocasio había alcanzado la mejoría médica máxima y concluyó que ésta adolece, como resultado directo del accidente, de 1% de impedimento en las funciones fisiológicas generales**.

38. **Al día de hoy, la señora Ocasio continúa experimentando dolor lumbosacral, dolor en la cadera derecha y dolor en el codo derecho como consecuencia del accidente; estos dolores son de intensidad moderada a severa y afectan su capacidad para realizar actividades cotidianas como sentarse, pararse, caminar, subir escaleras y levantar objetos.**

39. **El accidente ha tenido un impacto significativo en la vida de la demandante, limitando su capacidad para trabajar, participar en actividades sociales y disfrutar de sus pasatiempos.**

40. **Además, la demandante siente dolor de forma constante, lo que ha afectado su estado de ánimo y la ha llevado a sentirse deprimida; no menos importante, estos dolores afectan su capacidad para participar en actividades familiares, como asistir a los partidos de fútbol de su hijo, y la han obligado a tener que depender más de su familia para realizar tareas cotidianas.**

A base de las anteriores determinaciones de hechos probados el foro primario concluyó que tanto el Municipio de Bayamón como la AAA incumplieron con sus respectivos deberes y obligaciones por lo que estos eran responsables solidariamente por los daños sufridos por la Apelada, así como MAPFRE, aseguradora del Municipio de Bayamón. El foro primario razonó que toda vez que los municipios tienen el deber de

mantener las aceras bajo su control y jurisdicción en condiciones de razonable seguridad para las personas que por allí transitan de forma usual y la AAA el deber y la obligación de mantener aquellos equipos instalados en las aceras públicas en buenas condiciones, por el incumplimiento con ambos deberes responden solidariamente los municipios y la AAA. Sobre estos extremos, el TPI concluyó que el Municipio de Bayamón incumplió con tal deber al permitir que dos contadores sin tapa permanecieran en la acera bajo su control, lo que creó una situación peligrosa y que la AAA incumplió con su obligación de mantener los contadores, los cuales estaban sin tapa y en mal estado, lo que creó una situación peligrosa que reveló que la AAA no había dado el mantenimiento adecuado a sus equipos durante un tiempo considerable, lo quedó demostrado por el crecimiento de vegetación en su interior. Asimismo, razonó el foro primario que la AAA visitaba el área para leer los contadores de agua, por lo que la entidad conocía o debía conocer la condición peligrosa de dicho equipo, sin que tomara medidas al respecto y que ello probó una clara negligencia por parte de la AAA. Finalmente dispuso el TPI que tanto la AAA como el Municipio de Bayamón incumplieron con sus respectivos deberes **e impuso a la AAA el setenta y cinco porciento (75%) de la responsabilidad del accidente y el veinticinco porciento (25%) al Municipio de Bayamón.** En la distribución de responsabilidad, pesó en el ánimo del foro primario el hecho incontrovertido de que la condición peligrosa no yacía en la acera sino en los alrededores y a que el Municipio de Bayamón no tenía el control sobre los contadores, los cuales conforme a la prueba desfilada estaban deteriorados y cubiertos de vegetación.

Es preciso destacar que el foro primario le atribuyó entera credibilidad al testimonio de la señora Ocasio Vélez. En lo pertinente a la valorización de los daños sufridos por la señora Ocasio Reyes, el foro primario razonó que toda vez que la Apelada, además de adolecer de un uno porciento (1%) de impedimento de las funciones fisiológicas generales, sufrió traumas en otras áreas anatómicas, procedía apartarse del

precedente analizado, el caso *Canales Velázquez v. Rosario Quiles*, 107 DPR757 (1978) en el que se le otorgó a la demandante la suma de $20,000.00 tras un esguince cervical y lumbar sufrido a raíz de un accidente de tránsito. Finalmente, tras aplicar la fórmula establecida para la valorización de los daños el TPI concluyó que **el valor presente de dicha compensación asciende a $58,641.39 y en el ejercicio de su discreción, procedió a aumentar dicha cuantía a $65,000.00 al brindarle atención al hecho de que contrario al caso Canales Velázquez v. Rosario Quiles, supra, en el caso de epígrafe la Apelada, a raíz del accidente adolece del (uno porciento) 1% de impedimento de las funciones fisiológicas generales y además, sufrió traumas en otras áreas anatómicas**.

En desacuerdo, el 12 de marzo de 2025, la AAA presentó *Solicitud de Determinaciones de Hechos Adicionales y Solicitud de Reconsideración de Sentencia.*[16] En esencia, la AAA arguyó que procedía hacer una determinación de negligencia comparada y que, además, el TPI debía reconsiderar la Sentencia a los fines de imponer al Municipio de Bayamón un 50% de responsabilidad. De igual forma, la AAA cuestionó la suma de la compensación en daños otorgada a la señora Ocasio Reyes en la Sentencia.

En respuesta, el 13 de marzo de 2025, la señora Ocasio Reyes presentó *Oposición a Solicitud de Reconsideración y de Solicitud de Hechos Adicionales Determinaciones*; *Solicitud se Declare Sin Lugar*.[17] En síntesis, sostuvo que mediante el escrito de la AAA, la Apelante persigue relitigar su caso a los fines de que se determine que hubo ausencia de negligencia de su parte.

Mediante órdenes emitidas el 13 de marzo de 2025, notificadas el 19 de marzo del corriente año, el foro primario declaró No Ha Lugar a ambas solicitudes presentadas por la AAA.[18]

---

[16] Véase páginas 109-122 del Apéndice de la *Apelación*.
[17] Véase páginas 123-125 del Apéndice de la *Apelación*.
[18] *Véase* páginas 126-127 del Apéndice de la *Apelación*.

Inconforme, la AAA compareció ante nos mediante el recurso de epígrafe y señala la comisión de los siguientes errores por parte del foro primario:

1. ERRÓ EL TPI AL NO ADJUDICAR NEGLIGENCIA COMPARADA A LA APELADA.

2. ERRÓ EL TPI AL NO RECONSIDERAR SU SENTENCIA EN LA QUE ADJUDICA UNA COMPENSACIÓN EN DAÑOS POR LA SUMA DE $65,000 A LA APELADA.

3. ERRÓ EL TPI AL ADJUDICAR UN 75% DE NEGLIGENCIA A LA AAA Y TAN SOLO UN 25% AL MUNICIPIO DE BAYAMÓN, CUANDO FUE DEMOSTRADA Y NO CONTROVERTIDA, LA NEGLIGENCIA DEL MUNICIPIO DE BAYAMÓN Y SIN TOMAR CONOCIMIENTO JUDICIAL DE LA SENTENCIA DICTADA POR EL HONORABLE TRIBUNAL DE APELACIONES EN EL CASO *NANCY REYES REYES DÍAS V. MUNICIPIO DE CAGUAS Y OTROS,* CASO KLAN202400259, QUE ESTABLECE LA RESPONSABILIDAD DE LOS MUNICIPIOS Y AAA ES DE UN 50% CADA UNO SOBRE INSTALACIONES DE LA AAA EN PROPIEDAD MUNICIPAL.

Mediante *Resolución* de 18 de junio de 2025, notificada el 23 de junio del corriente año, concedimos a las partes hasta el 7 de julio de 2025 para presentar la transcripción de la prueba oral debidamente estipulada; el término de quince (15) días adicionales, luego de su presentación, para la presentación del *Alegato Suplementario* de la AAA y una vez presentado, concedimos a la Apelada treinta (30) días para presentar su Alegato en Oposición. El 7 de julio de 2025, las partes presentaron la *Transcripción de la Vista en su Fondo* estipulada. Por su parte, la AAA presentó su *Alegato Suplementario* el 22 de julio de 2025, por lo que la Apelada tenía hasta el 21 de agosto de 2025 presentar su Alegato en Oposición. Transcurrido en exceso dicho término, resolvemos sin el beneficio de su comparecencia.

**II.**

**A.     *Daños y Perjuicios***

El Artículo 1536 del Código Civil de Puerto Rico, dispone expresamente que "[l]a persona que por culpa o negligencia causa daño a otra, viene obligada a repararlo." 31 LPRA sec.10801. Véase, además, *Cruz Flores et al. v. Hosp. Ryder et al.*, 210 DPR 465 (2022); *Colón Santos v. Coop. Seg. Mult. P.R.* 173 DPR 170,177 (2008). Para que prospere una reclamación por daños y perjuicios al amparo de esta disposición el

reclamante debe probar 1) el acto u omisión culposa o negligente; (2) la relación causal entre el acto u omisión culposa o negligente y el daño ocasionado; y (3) el daño real causado al reclamante. *Cruz Flores v. Hosp. Ryder et al.*, supra; *Nieves Díaz v. González Massas*, 178 DPR 820, 843 (2010).

La culpa o negligencia es falta del debido cuidado, esto es, no anticipar ni prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en tales circunstancias. *Montalvo v. Cruz*, 144 DPR 748, 755 (1998). Si el daño es previsible por éste, hay responsabilidad; sino es previsible, estamos generalmente en presencia de un caso fortuito. *Montalvo v. Cruz*, *supra*, a la pág. 756. El deber de cuidado incluye, tanto la obligación de anticipar, como la de evitar la ocurrencia de daños, cuya probabilidad es razonablemente previsible. El deber de anticipar y prever los daños no se extiende a todo riesgo posible. *Íd.*

El daño constituye el menoscabo material o moral que sufre una persona, ya sea en sus bienes vitales naturales, en su propiedad o en su patrimonio, causado en contravención a una norma jurídica y por el cual ha de responder otra persona. En nuestro ordenamiento jurídico se reconoce la existencia de dos tipos de daños: los especiales, también conocidos como "daños físicos, patrimoniales, pecuniarios o económicos, y los generales, también conocidos como "daños morales". *Nieves Díaz v. González Massas*, *supra*; *Sagardia De Jesús v. Hosp. Aux. Mutuo,* 177 DPR 484, 505, (2009).

En ese sentido, nuestro más Alto Foro ha explicado la división que existe entre los daños patrimoniales y los no patrimoniales. *Sagardia De Jesús v. Hosp. Aux. Mutuo, supra.* El daño patrimonial es aquel menoscabo valorable en dinero sobre el patrimonio de la persona que ha sido perjudicada. *Sagardia De Jesús v. Hosp. Aux. Mutuo, supra,* a la pág. 506. Por otro lado, el daño no patrimonial es aquel que en principio "no tiene base equivalencial que caracteriza a los patrimoniales, por afectar

precisamente a elementos o intereses de difícil valoración pecuniaria". Íd. citando a J. Santos Briz, *Tratado de Derecho Civil*, Barcelona, Ed. Bosch, 2003, T. III, pág. 460.

Como parte de los daños no patrimoniales, se desprenden los daños morales los cuales son los "infligidos a las creencias, los sentimientos, la dignidad, la estima social o la salud física o psíquica del perjudicado". *Rivera v. SLG Diaz*, 165 DPR 408, 428 (2005). El Tribunal Supremo de Puerto Rico ha establecido que este concepto es amplio y abarca distintitas vertientes de la naturaleza del ser humano que van desde "el dolor físico o corporal, las angustias mentales, hasta los daños o las lesiones corporales". *Sagardia De Jesús v. Hosp. Aux. Mutuo*, supra, pág. 507.

En consecuencia, nuestro ordenamiento jurídico reconoce que las angustias mentales presuponen la concesión de un daño. *Cintrón Adorno v. Gómez,* 147 DPR 576, 597 (1999). Aquellas partidas que vayan dirigidas a indemnizar esas *angustias y sufrimiento mentales* tienen como finalidad remediar el dolor y los sufrimientos tanto físicos como mentales que padece una persona como consecuencia de un acto culposo o negligente. Íd. Si bien este tipo de daño no patrimonial no se funda en una equivalencia matemática, no por ello dejan de ser compensable en dinero. *García Pagán v. Shiley Caribbean*,122 DPR 193, 206 (1988).

**B.      *Responsabilidad de los Municipios por Accidentes en Aceras.***

En *Davidson v. H.I. Hettinger & Co.*, 62 DPR 301, 311 (1943), el Tribunal Supremo de Puerto Rico reconoció que los municipios son responsables por el mantenimiento y la reparación de las calles bajo su control. La referida normativa se reiteró en *Pérez v. Mun. De Lares*, 155 DPR 697, 711 (2001), caso en el que se reafirma la responsabilidad de los municipios por la condición de sus aceras. Véase, además, *González Meléndez v. Mun. San Juan et al,* 212 DPR 601, 613-614 (2023). Sobre estos extremos, en *Oliver v. Municipio de Bayamón*, 89 DPR 442, 444 (1963) se estableció la exigencia de que los municipios mantengan sus calles y aceras en condiciones de razonable seguridad.

**C.      *Responsabilidad de la AAA por Defectos en sus Equipos.***

La AAA, es una corporación pública e instrumentalidad autónoma del Estado Libre Asociado de Puerto Rico, creada en virtud de la Ley Núm. 40 del 1ro de mayo de 1945, según enmendada. 22 LPRA sec. 142. El propósito de la creación de la AAA es de proveer y ayudar a suministrar a los habitantes de Puerto Rico, un servicio adecuado de agua y alcantarillado sanitario y cualquier otro servicio o facilidades incidentales o propios a estos. 22 LPRA sec. 144.

En cumplimiento y de conformidad con la Sec. 4, subpárrafos (i), (j), (k) y (n) y la Sec. 19 de la Ley de Acueductos y Alcantarillado de Puerto Rico, la Ley Núm. 40 de 1 de mayo de 1945, según enmendada, y la Ley Núm. 38-2017, conocida como Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, 3 LPRA sec. 9601 *et seq.*, el 27 de diciembre de 2016, la AAA promulgó el Reglamento sobre el Uso de los Servicios de Acueducto y Alcantarillado Sanitario de Puerto Rico. (*Reglamento*). Este precepto reglamentario tiene el propósito de cumplir con las disposiciones de la Ley de la AAA, que exigen su promulgación (Art. 1.01 del *Reglamento*); facilitar el ordenado suministro de los servicios públicos para los cuales se creó la AAA; **proteger las instalaciones de los sistemas de esa instrumentalidad**; salvaguardar la salud pública y establecer los derechos y obligaciones correspondientes a los clientes, a los usuarios, al público y los de la Autoridad. (Énfasis nuestro). Art. 1.03 sobre Exposición de Motivos del *Reglamento*, a la pág. 1.

El Art. 1.05 (1) del aludido *Reglamento*, define el término *acometida de acueducto* como la conexión de tuberías desde la línea de la AAA, incluyendo la tubería de cobre que sale desde la caja del contador hasta una distancia de treinta (30) centímetros (o un (1) pie) dentro del límite del solar, pasando dicha tubería por debajo de la acera y quedando provista en su extremo de una llave de globo de bronce de diseño aprobado por la AAA. Para instalaciones donde por la naturaleza de la construcción, el área donde se encuentra u otras razones; no se ajuste la definición mencionada,

la responsabilidad de la AAA se limitará hasta (incluso) la llave de globo de bronce luego de la caja del contador, pero en ningún caso excediendo los seis (6) pies desde la caja del contador esté o no disponible la mencionada llave de globo. Pág. 2 del *Reglamento*. El inciso 2 del precitado *Artículo*, define *acometida de alcantarillado sanitario* como la conexión de tuberías desde la línea de la AAA hasta el registro o *clean out*, localizado en la colindancia con la propiedad a la que sirve. Pág. 2 del *Reglamento*. Mientras, en el inciso 19 del mismo *Artículo*, define el término *contador*, como el dispositivo que utiliza la AAA para registrar el consumo de agua servida por la AAA. Pág. 4 del *Reglamento*. El inciso 31 del *Reglamento*, define las *instalaciones interiores* como aquella tubería y accesorios conectados a ésta, más allá de la acometida, cuya operación y mantenimiento es responsabilidad del cliente o usuario. Pág. 4 del *Reglamento*.

Ahora bien, únicamente los funcionarios o representantes autorizados por la AAA son los que operarán sus sistemas de acueducto y de alcantarillado sanitario. Art. 2.01 del *Reglamento*, a la pág. 8.

El aludido Reglamento de la AAA, establece que todas las acometidas de acueducto y de alcantarillado sanitario, aprobadas e instaladas según las normas de diseño de la AAA, serán propiedad de ésta. Art. 2.06 del Reglamento, a la pág. 9. A su vez, el *Reglamento* dispone que cuando una acometida o caja de contador se rompa o dañe a causa de su localización en propiedad pública, la AAA, puede colocarla en un lugar más seguro, que bien podría ser la propiedad privada que recibe el servicio, al costo de la AAA. Ésta, se reserva el derecho de determinar la ubicación de las acometidas de conformidad a sus reglamentos. Art. 2.27 del Reglamento, a las págs. 16-17.

En cuanto a todos los contadores utilizados por la AAA para medir el consumo, el Art. 5.01 del precitado *Reglamento*, establece que éstos tienen que cumplir con los siguientes requisitos:

1. […]
2.

3.

4. **Serán propiedad de la Autoridad.**

5. **La Autoridad es responsable del mantenimiento de los contadores y sus accesorios, excepto lo contemplado en el Capítulo IV de este Reglamento.**

6. **La Autoridad se reserva el derecho de cambiar o reparar los contadores de acuerdo a los estándares aplicables.**

7. La Autoridad podrá contrastar los contadores cuando lo considere necesario.

8. Se considera un contador defectuoso cuando exceda los parámetros mínimos de error establecidos de acuerdo al estándar aplicable (AWWA, ISO).

9. […]

[…]

(Énfasis suplido).

Cónsono con lo anterior, ciertamente, es la AAA, la agencia dueña de los contadores, y; por consiguiente, la encargada de darles mantenimiento y de proteger las instalaciones de los sistemas de su pertenencia.

Es doctrina reiterada que la AAA como dueña de un equipo ubicado en la vía pública tiene la responsabilidad de revisar periódicamente sus contadores para asegurarse que no presenten condiciones peligrosas para los transeúntes y que esta responde por la existencia de una condición peligrosa en una alcantarilla que debió ser detectada y viene obligada a compensar a una parte por una cída ocasionada por defectos en sus equipos. *Véase Souffront v. AAA*.,164 DPR 663, 667 (1970); *Rodríguez v. AAA*, 98 DPR 872, 873 (1970); *Ginés Meléndez v. AAA*, 86 DPR 518, 525 (1962).

## D.        *La Negligencia Comparada*

La defensa de negligencia comparada tiene el efecto de atenuar la responsabilidad de la parte demandada de acuerdo con el grado de negligencia desplegado por la parte demandante que contribuye a la producción de sus propios daños. *Colón Santos v. Coop. Seg. Mult. PR,* 173 DPR 170 (2008), citando a *Velázquez v. Ponce Asphalt*, 113 DPR 39, 47 (1982) y *Quiñones López v. Manzano Posas*, 141 DPR 139 (1996). Esta norma tiende a individualizar las indemnizaciones por daño, colocando el rigor económico en las partes conforme a la proporción de su descuido y negligencia. *De León, Hernández v. Hosp. Universitario*, 174 DPR 393 (2008). La doctrina de negligencia comparada requiere que el

juzgador, además de determinar el monto de la compensación que corresponde a la víctima, establezca el porcentaje de responsabilidad o negligencia que corresponde a cada parte y reduzca la indemnización del demandante de conformidad con la distribución de responsabilidad efectuada. *SLG Colón-Rivas v. ELA*, 196 DPR 855,865 (2016), citando a H.M. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, pág. 410. Así, para determinar la negligencia que corresponde a cada parte en casos de negligencia comparada es necesario "analizar y considerar todos los hechos y circunstancias que mediaron en el caso, y particularmente si ha habido una causa predominante".

**E.      *La Distribución de Responsabilidad y la Valoración del Daño.***

En *Rodríguez et al. v. Hospital et al.,* 186 DPR 889, 892-93 (2012) el Tribunal Supremo dispuso que cuando un tribunal adjudique responsabilidad en un pleito de daños y perjuicios, debe incluir en su sentencia la porción de responsabilidad de todas las partes demandadas. El efecto oneroso se distribuye en proporción a los respectivos grados de negligencia de cada cocausante en la relación interna entre ellos. *S.L.G. Szendrey v. Hospicare, Inc.,* 158 DPR 648, 654 (2003).

En lo atinente a las acciones de daños y perjuicios, se ha reconocido que la tarea judicial de estimar los daños resulta angustioso y difícil, debido a que no existe un sistema valorativo que permita llegar a un resultado exacto. *Rodríguez et al. v. Hospital et al.,* 186 DPR 889, 909 (2012); *Herrera, Rivera v. S.L.G. Ramírez Vicéns,* 179 DPR 774, 784 (2010); *Publio Díaz v. E.L.A.,* 106 DPR 854, 867 (1978); *Urrutia v. AAA,* 103 DPR 643, 647 (1975).

En lo pertinente a la **valoración de los daños físicos y angustias mentales,** es ilustrativo el caso *Canales Velázquez v. Rosario Quiles*, 107 DPR757 (1978). Allí, a raíz de un accidente vehicular, Canales Velázquez sufrió de espasmos musculares agudos, limitación de movimiento en las regiones cervicales y lumbosacrales e inflamación en los músculos

pectorales izquierdos. Por dicho cuadro se le prescribió una serie de medicamentos y fue referida a una fisiatra, quien la sometió a un riguroso programa de terapias y le recomendó el uso de un collar cervical. Ante el hecho de que no mejoraba la condición de la paciente, se le practicaron nuevos estudios que revelaron que uno de los nervios estaba pinchado a uno de los discos intervertebrales. Para corregir tal condición, fue sometida a una intervención quirúrgica. Luego de tal operación, se reanudó el tratamiento y la terapia de la paciente, ya que los padecimientos, aunque en grado menor, persistieron especialmente en la región cervical, provocando que ésta no pudiera doblarse, levantar peso, ni estar mucho de pie, ni sentada como tampoco caminar mucho. Canales Velázquez recibió tratamientos desde el día siguiente al suceso que la mantuvieron imposibilitada de trabajar por un período de dos meses. El Tribunal Supremo confirmó la cuantía de $20,000 por concepto de daños físicos y angustias mentales que otorgó a Canales Velázquez el Tribunal de Primera Instancia.

Nuestro ordenamiento jurídico reconoce, además, que las angustias mentales presuponen la concesión de un daño. *Cintrón Adorno v. Gómez,* 147 DPR 576, 597 (1999). Aquellas partidas que vayan dirigidas a indemnizar esas *angustias y sufrimiento mentales* tienen como finalidad remediar el dolor y los sufrimientos tanto físicos como mentales que padece una persona como consecuencia de un acto culposo o negligente. Íd. Si bien este tipo de daño no patrimonial no se funda en una equivalencia matemática, no por ello dejan de ser compensable en dinero. *García Pagan v. Shiley Caribbean,* 122 DPR 193, 206 (1988).

Para que una reclamación de este tipo proceda, es imprescindible probar sufrimientos y angustias morales profundas. *Ramos Rivera v. E.L.A.,* 90 DPR 828 (1964). Por consiguiente, es necesario que la parte afectada presente prueba para que el juzgador pueda determinar el valor razonable de los daños morales, probando que no se trata de una simple pena pasajera. *Moa v. ELA,* 100 DPR 573, 587 (1972). Se debe demostrar

ante el juzgador de los hechos que "dichos daños han afectado la salud, el bienestar, la felicidad del damnificado". *Ramos Rivera v. ELA*, supra, pág. 831. En síntesis, para que se pueda indemnizar un daño, es necesario "Para realmente sufrirlo y probarlo. *Cintrón Adorno v. Gómez,* supra, pág. 589.

Cónsono con lo anterior, nuestro ordenamiento jurídico ha reiterado que la tarea de estimar el valor de los daños sufridos en una acción culposa es una labor ardua dado a que no existen fórmulas matemáticas o científicas que indiquen con exactitud como se debe mesurar el dolor y el sufrimiento. *Herrera, Rivera v. SLG Ramírez-Vincéns,* 179 DPR 774, 784 (2010). Igualmente, ha quedado establecido que dado a que los tribunales de instancias están en contacto directo con la prueba, los foros apelativos deben abstenerse de intervenir con respecto a las cantidades concedidas por el juzgador de los hechos. *SLG Rodríguez v. Nationwide*, 156 DPR 614, 623 (2002).

Empero, los tribunales revisores pueden intervenir cuando la cuantía impuesta resulte ridículamente baja o exageradamente alta. *Santiago Montañez v. Fresenius Med.,* 195 DPR 476, 490 (2016). Esto responde a que el "ejercicio de valoración de daños involucra cierto grado de especulación y elementos subjetivos, tales como la discreción y el sentido de justicia y conciencia humana del juzgador de los hechos". Íd. Además, es el foro primario quien tiene contacto directo con la prueba testifical y por lo tanto se encuentra en una mejor posición para emitir un juicio a la valorización de los daños. Íd. pág. 491.

La valoración o cuantificación del daño, descansa inicialmente en el ejercicio discrecional, prudente, juicioso y razonable del juzgador de hechos animado por un sentido de justicia y de conciencia humana. *S.L.G. v. F.W. Woolworth & Co., 143 DPR 76 (1997).* El daño a ser compensado no puede subvalorarse meramente por el carácter especulativo que conlleve necesariamente el cómputo. Claro está, al medirlos, el juzgador debe hacerlo a base de la prueba, procurando siempre que la

indemnización no se convierta en una industria y se mantenga su sentido remediador, no punitivo. *Rodríguez Báez v. Nationwide Insurance Co., 156 DPR 614 (2002).* Por tanto, los tribunales deben buscar una proporción razonable entre el daño causado y la indemnización concedida, de modo que la adjudicación sea razonablemente balanceada, es decir, ni extremadamente baja ni desproporcionadamente alta*. Blás v. Hosp. Guadalupe,* 146 DPR 267, 339 (1998). La valoración responde a factores particulares y únicos de cada caso, por lo que debe ser considerada conforme los hechos y circunstancias particulares. *Íd.*

De otra parte, la tarea de estimar y valorar daños es una labor difícil y ardua, pues no existen fórmulas científicas de especificidad exacta que indiquen cómo se justiprecia el dolor y el sufrimiento. *Santiago Montañez v. Fresenius Medical*, 195 DPR 476 (2016). Precisamente por la dificultad que entraña esta gestión, existe una norma de abstención judicial de parte de los foros apelativos fundada en criterios de estabilidad y deferencia hacia los tribunales de instancia. *Urrutia v. A.A.A.*, 103 DPR 643, 647-648 (1975). Por tanto, los tribunales apelativos no debemos intervenir con la apreciación de la prueba y con la determinación de daños que un tribunal de instancia haya emitido, a menos que las cuantías concedidas sean ridículamente bajas o exageradamente altas. *Albino v. Ángel Martínez, Inc.*, 171 DPR 457, 486-487 (2007). Ello, responde a que los jueces de instancia están en mejor posición que los tribunales apelativos para evaluar los daños, toda vez que éstos son los que tienen contacto directo con la prueba presentada. *Blás v. Hosp. Guadalupe*, supra.

Sin embargo, nuestro Tribunal Supremo ha destacado que cuando a este Foro apelativo le corresponda examinar si la compensación concedida por el Tribunal de Primera Instancia es ridículamente baja o exageradamente alta, debemos examinar la prueba desfilada ante ese Foro y las cuantías otorgadas en casos similares resueltos anteriormente. *Santiago Montañez v. Fresenius Medical,* supra. En este sentido, las indemnizaciones concedidas en casos anteriores constituyen un punto de

partida y referencia útil para pasar juicio sobre las concesiones otorgadas por el foro primario. *Santiago Montañez v. Fresenius Medical, supra; Rodríguez et al v. Hospital et al,* 186 DPR 889 (2012). Ello es así, aun cuando reconocemos que no existen dos casos exactamente iguales y que cada caso es distinguible según sus circunstancias particulares. *Santiago Montañez v. Fresenius Medical, supra.* Para **valorar los daños y establecer las cuantías se deben examinar las cuantías otorgadas en casos similares y dicha cantidad se multiplica por el poder adquisitivo del dólar para el año en que se emitió el dictamen.** *Id.* No debemos intervenir con la estimación de daños del foro de primera instancia, salvo que las cuantías concedidas sean ridículamente bajas o exageradamente altas. *Santiago Montañez v. Fresenius* Medical, *supra*, pág. 490; *Rodríguez et al v. Hospital et al,* 186 DPR 889 (2012). En todo caso, estas compensaciones otorgadas en casos anteriores deben ajustarse a su valor presente. *Íd.*

Es norma establecida que la parte que solicita la modificación de las sumas concedidas **tiene la obligación de demostrar la existencia de las circunstancias que hacen meritorio su modificación**. *Canales Velázquez v. Rosario Quiles*, 107 DPR 757 (1978).

La estimación de los daños es una difícil tarea que descansa en la sana discreción del juzgador que ha recibido prueba detallada sobre los daños alegados, guiado por su sentido de justicia, ante todo, porque son ellos quienes tienen un vínculo más cercano con la prueba testifical y todos los componentes que lo rodean. *Sucn. Mena Pamias, et als v. Meléndez, et als*, 212 DPR 758, 774 (2023); *Cruz Flores v. Hosp. Ryder et al.*, 210 DPR 465, 483 (2022).

**F. *Evaluación de la Prueba Oral y la Prueba Pericial***

La Regla 43.2 de Procedimiento Civil, 32 LPRA Ap. V. R. 43.2 establece en lo pertinente que "[l]as determinaciones de hecho basadas en el testimonio oral no se dejarán sin efecto a menos que sean claramente

erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos."

Por lo que como norma general no hemos de intervenir, ni alterar, innecesariamente, las determinaciones de hecho formuladas por el foro primario "[l]uego de admitir y aquilatar la prueba presentada durante el juicio". *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 65 (2009). No podemos "[d]escartar y sustituir las determinaciones tajantes y ponderadas del foro de instancia". *Íd.*, en las págs. 65-66. Nuestro esquema probatorio otorga deferencia a las determinaciones de hecho, la apreciación de la prueba testifical y las adjudicaciones de credibilidad que realiza el juzgador del foro primario. Como norma general, los tribunales apelativos no intervenimos con la apreciación de la prueba, la adjudicación de credibilidad y las determinaciones de hechos que realiza ese foro. *Pueblo v. Rivera Montalvo*, 205 DPR 352 (2020) (2020); *Sucn. Rosado v. Acevedo Marrero,* 196 DPR 844, 917 (2016); *Dávila Nieves v. Meléndez Marín,* 187 DPR 750 (2013). Sin embargo, esa deferencia descansa en un marco de discreción y razonabilidad. *Citibank NA v. Cordero Badillo,* 200 DPR 724, 735 (2018); *Medina Nazario v. Mc Neil Healthcare LLC,* 194 DPR 723, 729 (2016). La discreción es "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera". *Medina Nazario v. McNeil Healthcare LLC, supra*, pág. 729. Así que, ese juicio discrecional "no es en función al antojo o voluntad de uno, sin tasa ni limitación alguna". *Santa Aponte v. Srio. Hacienda,* 105 DPR 750, 770 (1977). Los tribunales revisores podremos sustituir el criterio que utilizó el foro primario por el nuestro únicamente cuando existen circunstancias extraordinarias en las que se pruebe que el foro primario actuó con pasión, prejuicio o parcialidad, incurrió en craso abuso de discreción o en un error manifiesto o de derecho. *Citibank NA v. Cordero Badillo, supra*, pág. 736.

El juzgador incurre en pasión, prejuicio o parcialidad si actúa "movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas

que o admiten cuestionamiento sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna". *Dávila Nieves v. Meléndez Marín, supra*, pág. 782. Por otro lado, un tribunal puede incurrir en abuso de discreción cuando el juez: (1) ignora sin fundamento algún hecho material importante que no podía pasar por alto, (2) concede demasiado peso a un hecho inmaterial y funda su decisión principalmente en ese hecho irrelevante, (3) a pesar de examinar todos los hechos del caso, hace un análisis liviano y la determinación resulta irrazonable. *Pueblo v. Sanders Cordero,* 199 DPR 827, 841 (2018); *Pueblo v. Custodio Colón,* 192 DPR 567, 588-589 (2015). Por último, un juzgador incurre en error manifiesto que justifica la intervención del tribunal apelativo cuando "la apreciación de esa prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble". *Pueblo v. Irizarry,* 156 DPR 780, 816 (2002).

De otra parte, la Regla 702 de Evidencia, 32 LPRA Ap. VI, R. 702, regula el testimonio pericial. Reza la norma, en su parte pertinente:

> Cuando conocimiento científico, técnico o especializado sea de ayuda para la juzgadora o el juzgador poder entender la prueba o determinar un hecho en controversia, una persona testigo capacitada como perita —conforme a la Regla 703— podrá testificar en forma de opiniones o de otra manera. [...]

En nuestro ordenamiento jurídico, rige una norma liberal, en cuanto a la capacidad de un testigo para declarar, pero no necesariamente para cualificarse como perito. A esos fines, la Regla 703 de Evidencia, 32 LPRA Ap. VI, R. 703, establece:

> Calificación de la persona perita:
>
> (a) Toda persona está calificada para declarar como testigo pericial si posee especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente para calificarla como experta o perita en el asunto sobre el cual habrá de prestar testimonio. Si hubiere objeción de parte, dicho especial conocimiento, destreza, adiestramiento o instrucción deberá ser probado antes de que la persona testigo pueda declarar como perita.
>
> (b) El especial conocimiento, destreza, experiencia, adiestramiento o instrucción de una persona que es testigo pericial podrá ser probado por cualquier evidencia admisible, incluyendo su propio testimonio.
>
> (c) La estipulación sobre la calificación de una persona perita no es impedimento para que las partes puedan presentar prueba sobre el valor probatorio del testimonio pericial.

De la norma precitada se desprende que, a través de su educación o experiencia, el perito ha desarrollado un conocimiento o destreza sobre una materia, por lo cual puede formar una opinión que sirva de ayuda al juzgador de hechos. *S.L.G. Font Bardón v. Mini-Warehouse*, 179 DPR 322, 338 (2010). Por tanto, una persona puede cualificarse como perito por los conocimientos especializados que posee, ya sean producto de su experiencia o de su educación. *Dye–Tex P.R., Inc. v. Royal Ins. Co. P.R.*, 150 DPR 658, 663 (2000). No obstante, no se requiere que tenga una licencia para practicar una profesión o tenga cierta formación educativa. *Id.*

Ante la prueba pericial y documental, el tribunal revisor se encuentra en igual posición que el foro recurrido y, por tanto, está facultado para apreciar la prueba apoyándose en su propio criterio. *Dye-Tex de P.R., Inc. v. Royal Ins. Co.*, 150 DPR 658, 662 (2000).

El valor probatorio del testimonio pericial dependerá de varios factores, a saber: (1) si el testimonio está basado en hechos o información suficiente; (2) si el testimonio es producto de principios y métodos confiables; (3) si la persona aplicó los principios y métodos de manera confiable a los hechos del caso; (4) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica; (5) las calificaciones o credenciales de la persona testigo, y (6) la parcialidad de la persona testigo. Regla 702 de Evidencia, *supra*. Estos criterios no constituyen una lista taxativa, toda vez que, para conferir valor probatorio al testimonio pericial, lo esencial es su confiabilidad. "Existen otros factores que muy bien pudieran afectar el valor probatorio del testimonio pericial". *Informe de las reglas de derecho probatorio*, Tribunal Supremo de Puerto Rico, Secretariado de la Conferencia Judicial y Notarial, marzo de 2007, pág. 424. En armonía, el alto foro ha enunciado que "[e]l juez tiene una amplia discreción con relación a la admisión o exclusión de la prueba pericial. Sus determinaciones deben ser sostenidas a menos que sean claramente erróneas". *S.L.G. Font Bardón v. Mini-Warehouse*, *supra*, pág.

343. La prueba pericial debe excluirse cuando no sea de ayuda al juzgador. *I d.*

A tenor con lo dicho, los foros apelativos no deben intervenir con la apreciación de la prueba realizada por el Tribunal de Primera Instancia, a menos que se demuestre que medió pasión, prejuicio, parcialidad o error manifiesto del foro primario. *Sucn. Rosado v. Acevedo Marrero*, supra; *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 753-754 (2013); *Rivera Menéndez v. Action Service*, 185 DPR 431, 444 (2012); *Rodríguez v. Urban Brands*, 167 DPR 509, 522 (2006).

Tan solo podríamos intervenir con la apreciación de la prueba, cuando de un examen detenido de la misma quedemos convencidos de que el juzgador descartó injustificadamente elementos probatorios importantes o que fundamentó su criterio únicamente en testimonios de escaso valor, o inherentemente improbables o increíbles. *C. Brewer P.R., Inc. v. Rodríguez*, 100 DPR 826, 830 (1972); *Pueblo v. Luciano Arroyo*, 83 DPR 573, 581 (1961).

## III.

Es la contención principal de la AAA en su primer señalamiento de error que incidió el foro primario al no hacer una determinación sobre negligencia comparada con respecto a la Apelada. En síntesis, sostiene la AAA, en su *Alegato Suplementario* que de la prueba oral desfilada surgen ciertas contradicciones en el testimonio de la señora Ocasio Vélez que ameritaban la imposición de cierto grado de negligencia a la Apelada y una reducción de la compensación concedida por los daños sufridos a raíz de la caída.

Arguye la AAA que, aunque surge de la prueba oral que la Apelada no se había percatado del contador de agua, surge además, que la señora Ocasio Vélez estaba conversando por el celular mientras caminaba y llevaba unos documentos en el brazo izquierdo cuando sufrió la caída. Argumenta, además, la Apelante que a pesar de lo declarado por la Apelada en cuanto a que no se había percatado del contador de agua, esta

además, declaró que dicho contador quedaba frente a su lugar de trabajo, al cual acudía de lunes a viernes. Razona la AAA que ello es una incongruencia y por ello cuestiona la credibildad adjudicada por el TPI al testimonio de la Apelada.

Sobre estos extremos, razona la AAA en su segundo señalamiento de error, que incidió, además, el foro primario al no reconsiderar su *Sentencia* en la que adjudicó una compensación en daños de $65,000 a favor de la Apelada, cuando dicha compensación debió reducirse al incurrir la señora Ocasio Vélez en negligencia comparada. Sostiene, además, la AAA que dicha suma es excesiva.

Conforme a la deferencia que nos merece la adjudicación de credibilidad del foro primario al testimonio de la Apelada, concluimos que en el presente caso de la prueba oral desfilada no surgen incongruencias que nos lleven razonablemente a variar las determinaciones de hecho del TPI ni a concluir que la señora Ocasio Vélez incurriera en negligencia comparada.

Del examen detenido de la Transcripción de la Prueba, no hallamos indicios de arbitrariedad o error manifiesto en la apreciación de la prueba oral por parte del TPI ni la existencia de otra prueba en el récord que menoscabe su valor probatorio ni la credibilidad atribuida por el foro primario a la prueba oral. Las determinaciones de hechos y de credibilidad del tribunal sentenciador deben ser merecedoras de gran deferencia por parte de los foros apelativos. *Argüello v. Argüello*, 155 DPR 62 (2001); *Hernández Maldonado v. Taco Maker*, 181 DPR 281 (2011); *SLG Rivera Carrasquillo v. AAA*, 117 DPR 345, 356 (2009); *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 779 (2022).

Lo que si surge de la prueba desfilada es que el contador de agua de la AAA estaba deteriorado, sin tapa, cubierto de vegetación y sin mantenimiento, lo cual indudablemente constituye negligencia por parte de la Apelante y que dicha negligencia, ocasionó la caída de la Apelada a raíz de la cual esta sufrió los daños probados.

En el caso que nos ocupa, para la valoración de los daños sufridos por la Apelada el foro primario utilizó como precedente el caso *Canales Velázquez v. Rosario Quiles*, *supra*; trajo dicho monto a su valor presente y finalmente luego de ello, en el ejercicio de su discreción aumentó la compensación, al razonar que en el caso de epígrafe, la señora Ocasio Reyes sufrió además, lesiones adicionales a las de la demandante en *Canales Velázquez v. Rosario Quiles*, *supra* en otras parte de su cuerpo que aumentaron sus sufrimientos. La valoración de los daños sufridos por la Apelada y probados ante el foro primario, consiste de una suma razonable, basada en el precedente, atemperada a los hechos particulares y ajustada a su valor presente. *Íd.*

La parte que solicita la modificación de las sumas concedidas **tiene la obligación de demostrar la existencia de las circunstancias que hacen meritorio su modificación**. *Canales Velázquez v. Rosario Quiles*, 107 DPR 757 (1978). La AAA no ha establecido la existencia de circunstancias que ameriten la modificación de la cuantía en el presente caso. En ausencia de negligencia comparada por parte de la Apelada, no procede variar el monto de la compensación establecida por el foro primario por los daños sufridos por la señora Ocasio Vélez.

Finalmente la AAA señala como tercer error incurrido por el foro primario que incidió el TPI al adjudicar un setenta y cinco porciento (75%) de negligencia a la AAA y tan solo un veinticinco porciento (25%) de negligencia al Municipio de Bayamón. En dicho señalamiento de error, la AAA y nos invita a adoptar el razonamiento de un Panel Hermano de este Tribunal de Apelaciones en el dictamen emitido en el caso con designación alfanumérica KLAN202400259, en el que se impuso a un municipio un cincuenta por ciento (50%) de responsabilidad y a la AAA el otro cincuenta por ciento (50%) por los daños sufridos por un demandante sobre instalaciones de la AAA en una acera.

Es preciso destacar que la distribución de responsabilidad depende de la prueba desfilada y se determinará caso a caso. Surge de la Sentencia

apelada que, en la distribución de responsabilidad, cuestionada por la AAA, pesó en el ánimo del foro primario el hecho incontrovertido de que la condición peligrosa no yacía como tal en la acera sino en los alrededores de la Avenida Los Millones y a que el **Municipio de Bayamón no tenía el control sobre el contador de agua,** el cual conforme a la prueba desfilada estaba deteriorado, sin tapa y con falta de mantenimiento por parte de la AAA al estar cubierto de vegetación.

Con estos antecedentes, es forzoso concluir que el foro primario no incurrió en los errores señalados por la AAA, por lo que procede confirmar la Sentencia apelada en todos sus extremos.

## IV.

Por los fundamentos anteriormente expuestos, los cuales hacemos formar parte de esta Sentencia, confirmamos la Sentencia apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones